Stevie W. NORRIS, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 580S155.

Supreme Court of Indiana.

April 16, 1981.

130 ■

George K. Shields, Indianapolis, for appellant.

Theodore L. Sendak, Atty. Gen., Frederick N. Kopec, Deputy Atty. Gen., Indianapolis, for appellee.

PRENTICE, Justice.

Defendant (Appellant) was convicted after trial by jury of attempted murder, Ind. Code § 35–42–1–1; § 35–41–5–1 (Burns 1979), two counts of battery, Ind.Code § 35–42–2–1 (Burns 1979), resisting arrest, Ind.Code § 35–44–3–3 (Burns 1979), and possession of a controlled substance, Ind. Code § 35–48–4–7 (Burns 1979). He was sentenced to five concurrent terms, the longest being twenty (20) years for attempted murder. This direct appeal presents two main issues:

(1) Whether the evidence was sufficient to support any of the verdicts.

(2) Whether the trial court erred in requiring the defendant to prove his insanity by a preponderance of the evidence.

This is a tragic incident concerning the defendant's abuse of phencyclidine (PCP).

On the evening of June 21, 1979, Rita Sanford and the defendant went to bed. The defendant could not sleep. He got up and went into the bedroom of Rita's three year old son, Eric, and sat on the bed. Rita found him there and asked what he was doing. He said he was just sitting there.

Rita went next door to get herself and the defendant a drink. When she returned, the defendant was no longer in Eric's bedroom. She walked down the hall, and as she passed the bathroom, the defendant, now naked, opened the bathroom door and pulled her inside. He said very quietly that *someone* was out there. Rita told him that no one was there but followed his direction to be quiet so that they would not hear anything.

Through an open window Rita heard the noise of children playing. The defendant closed the curtains and again told her to be quiet because *they* were out there and were going *to get* him and her. At this time, Rita observed that the defendant was holding a piece of a wooden bedpost in his hand. He told her that he was not going to let *them* hurt her because he loved her, and he then hit her on the head with the bedpost. Rita began to cry and told the defendant to stop; but the defendant said, "I told you I'm not gonna let *them* hurt you." Next, he told her to face the wall and not to turn around and struck her repeatedly with the bedpost. Rita fell on the floor bleeding and crying.

The commotion awakened Eric, who came down the hall, crying, and the defendant said, "Here *they* come." Rita responded, "It's just Eric.", whereupon the defendant jerked open the bathroom door, looked straight ahead and went to grab the child. Rita tried to stop him, but the defendant knocked her into the bathtub. Defendant then threw Eric onto the floor and hit his head twice with the bedpost, causing multiple skull fractures. After the first blow to

Eric's head, Rita again tried to stop the defendant. She succeeded by telling him that there was someone out there and that the defendant should go and get them. The defendant said, "I told you I'm not gonna let *them* hurt you. Because I love you." The defendant then left the bathroom and Rita screamed out the window for help but was ignored. She gathered up Eric, went to a neighbor's and called the police.

Officer John Miller arrived at the scene to find Rita holding Eric, who was bleeding. She told him about the beating, and he asked where the defendant was. Rita indicated the upstairs apartment in the rear. Miller went to the apartment and opened the door. He identified himself and yelled in that he wanted the defendant to come out. Miller waited thirty seconds and then started up the stairs. It was pitch dark in the apartment and quiet. Miller again yelled for the defendant to come down. He reached the top of the stairs and opened the door on his left, took a step into the room, shined his flashlight, and caught a movement out of the corner of his eye. As Miller turned on the light, the defendant hit him on the forehead with the bedpost, knocking him out of the room.

Miller called for assistance, and the defendant went out a window onto the roof. The defendant jumped some three to four feet down onto the roof of the building next door. He became wild and violent, swinging his fists and kicking his feet. It took three police officers to apprehend him.

\* \* \* \* \* \*

### ISSUE I

The defendant first claims that the evidence shows that his conduct was neither intentional nor knowing. At trial he interposed an insanity defense. His argument is that the evidence shows that he " \* \* \* *was not even* aware of what he was doing, and had no intention of committing any crime."

The defendant's argument does not recognize the statutory concept of criminal culpability as provided by Ind.Code § 35-41-2-2 (Burns 1979):

"(a) A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so.

"(b) A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so."

Knowing or intentional conduct is a requisite element of each of the five offenses charged.

Rita Sanford and Officer Miller testified about the events of that evening. It appears that the defendant's conduct was both bizarre and out of character, and there was evidence from which the jury could have found that he was acting under a self-administered injection of PCP. *Jackson v. State*, (1980) Ind., 402 N.E.2d 947, 949. While there is no direct evidence that the defendant used PCP prior to the incident on the night in question, Rita testified that she had seen the defendant use it on one of the two previous nights, and that he used PCP two to three times a week. On that day she had hidden drug paraphernalia and a quantity of PCP from the defendant, because she did not want the defendant to use them. She testified further that in the past, when the defendant had been under the influence of PCP, he had acted dumb and childish, but had never reacted violently.

The evidence shows that the defendant's paranoia and delusions had begun about twenty-four to forty-eight hours before he became violent. He had taken PCP and had awakened Rita as "he was scootin' up in the corner between the bed and the wall." The defendant had told her to be quiet and that he thought Officer Miller was in the house. The defendant and Officer Miller had met on prior unrelated matters, and the defendant had known Miller for quite awhile. On that occasion, the defendant then pulled Rita close to him and said, "Now as soon as you see him you jump on the floor, and I'll shoot him." They then got up and walked through the house so that Rita could show him that no one was in the house. The defendant closed all the windows and said that Officer Miller was outside and would shoot him through the window. He then used pieces of a broken

bed to jam the windows shut and placed chairs under the doorknobs to jam the doors shut. He told Rita to remain quiet and that he was afraid that Officer Miller would put a ladder to one window and get him. The defendant was also shaking from chills and complaining that he was hot. This behavior continued until dawn of the next day.

On prior occasions the defendant had expressed fears to Rita that Officer Miller would kill him.

■ The trier of fact must resort to reasonable inferences based upon examination of the surrounding circumstances to infer the existence of knowing or intentional conduct. *Farno v. State*, (1974) 159 Ind.App. 627, 629, 308 N.E.2d 724, 725, (cases cited therein).

■ On this record we cannot say that the defendant was somehow unaware of his possession of PCP or that it was not his conscious objective to possess it and to use it. The police found PCP and drug paraphernalia in the defendant's apartment, and the defendant was a regular user. The evidence is sufficient to support the possession conviction.

■ While the defendant may have been suffering from delusional paranoia and hallucinations, the jury could have found that when he struck the blows against Rita Sanford and Officer Miller, he intended to harm someone. Therefore, the evidence is sufficient to support the convictions for battery and resisting arrest.

■ The defendant further contends that there is no evidence to show that Rita Sanford suffered "serious bodily injury" required to support a conviction of battery, Class C Felony. Ind.Code § 35-42-2-1(3) (Burns 1979). There is no merit to this contention. *Barbee v. State*, (1977) 267 Ind. 299, 396 N.E.2d 1072. The record contains photographs of Rita Sanford taken after she received treatment for her injuries. They depict the numerous cuts and bruises

that were inflicted. One head wound required stitches, and she spent five days in the hospital.

■ The defendant next contends that he was so intoxicated that he could not form any specific intent to commit any of the offenses of which he stands convicted. Ind.Code § 35-41-3-5(b) (Burns 1979). He assumes incorrectly, however, that all the offenses charged are specific intent crimes; only the attempted murder of Eric Sanford is. *Zickefoose v. State*, (1979) Ind., 388 N.E.2d 507, 510. *See Preston v. State*, (1972) 259 Ind. 353, 356, 287 N.E.2d 347, 348.[1]

■ The acts related above appear to be those of a maniac, *Stout v. State*, (1974) 262 Ind. 538, 541, 319 N.E.2d 123, 124; however, whether or not the defendant's voluntary intoxication prevented him from forming the specific intent required for attempted murder was a question of fact for the jury and one upon which the defendant bore the burden of proof. *Bates v. State*, (1980) Ind., 409 N.E.2d 623, 625 (cases cited therein).

In *Bates*, which dealt with a defendant's claim of voluntary drug intoxication, we stated the standard of review for such cases:

■ As this Court stated in *Booher v. State*, (1901) 156 Ind. 435, 60 N.E. 156:

"It does not follow, by any means, in any criminal case, in which the intoxication of the accused person may be considered in evidence, that the fact that at the time he committed the alleged crime he was intoxicated, he was thereby rendered incapable of entertaining the specific felonious or criminal intent with which he is charged. He may have been grossly intoxicated and yet capable of forming the intent to kill and murder or to commit any other offense in which an intent is an essential element. The cor-

---

1. The problems encountered by Indiana courts in determining to which offenses voluntary intoxication is available as a defense are reviewed in *Carter v. State*, (1980) Ind.App., 408 N.E.2d 790. These problems are alleviated by the Legislature's amendment of Ind.Code 35-41-3-5(b) (Burns Supp.1980).

rect rule or test in such cases, and the one generally asserted by the authorities, is that the (intoxication) of the defendant, in order to rebut such criminal intent, must be of such a degree as to deprive him of the power to deliberate or form the necessary design or guilty intent; otherwise it is not available. Or, in other words, as affirmed in *Aszman v. State*, 123 Ind. 347, 24 N.E.2d 123, 8 L.R.A. 33, mere intoxication of the accused, in the absence of such mental capacity resulting therefrom as will render a person incapable of thinking deliberately and meditating rationally, in forming the guilty design or intent, can not be regarded as sufficient." *Id.*

 From all the evidence, the jury was entitled to infer that the defendant, suffering from delusions and paranoia, intended to kill whomever was on the other side of the bathroom door, when he opened it and found Eric Sanford. The defendant had been suffering from a fear that *someone* was in the house; that *someone* was trying to get him; and that that *someone* was Officer Miller, whom the defendant believed, rightly or wrongly, was out to get him. Rita Sanford testified that on opening the bathroom door, the defendant looked " * * * straight ahead, you know, like somebody as big as him." The defendant then used a weapon in a manner which would cause death. *Jackson v. State, supra; See Dobbs v. State*, (1957) 237 Ind. 119, 124, 143 N.E.2d 99, 101. Under such circumstances, the jury could find that the defendant intended to use the bedpost to kill someone. *See Burkhalter v. State*, (1979) Ind., 397 N.E.2d 596, 598. *Hooker v. State*, (1979) Ind.App., 387 N.E.2d 1354, 1358 n.1. Under the doctrine of transferred intent, the essential element is present if the accused intended to kill someone. *Taylor v. State*, (1973) 260 Ind. 264, 279–80, 295 N.E.2d 600, 609, *cert. denied*, (1973) 414 U.S. 1012, 94 S.Ct. 377, 38 L.Ed.2d 250.

The remainder of the defendant's argument on this point deals with the testimony of his own expert witness concerning the symptoms of a toxic reaction to PCP.

These symptoms include amnesia (the defendant had no recollection of the incident), violent behavior, rage reaction, misperception of surroundings, and reacting to imaginary situations. The Witness further testified:

"Q. We've been talking a little bit here about the toxic effect, of PCP. Do you believe that what we've described here could be defined as a mental disease?

"A. (pause) I think in the sense that the brain is malfunctioning that, yes, its a diseased situation in the brain.

"Q. As a result of this brain dysfunction, or malfunction, to cause a mental disease, is a person able to know the wrongfulness of his acts, or to be cognizant of his acts?

"A. During the toxic state, no.

"Q. In fact, during this toxic state is a person able to form any sort of intent to do any specific act?

"A. Nothing that's reality-based, no. I think the meaning of intent implies reality contact.

"Q. And in your opinion, from your observations of Steve and your knowledge of what happend (sic) that night, was Steve in such a high toxic state that he was not able to know or appreciate the wrongfulness of his acts or to form such intent?

"A. I'm convinced of that. The entire picture is (sic) described to me from start to finish was typical of a PCP toxic reaction in which a person has no intent, no knowledge of what's happening."

This evidence was introduced on the issue of insanity and was rebutted by the testimony of a court appointed psychiatrist who stated:

"Q. Isn't it true that with PCP that it's a very unpredictable drug?

"A. Well there have been reports of very severe reactions to PCP, yes, it's considered one of the more dangerous you might say of the street

drugs. A lot of behavior and assaultiveness and violence associated with it. Same as with alcohol.

"Q. This violence that is associated with it, with PCP or alcohol, is the brain malfunctioning to such a point that the person cannot control his impulses so that he exhibits this violent nature?

"Q. (sic) The drugs generally have the effect of the individual not having much concern about what they are doing, and if they have angry or assaultive or violent tendencies they are more likely to express them, because they don't care about the consequences.

"Q. Do they know the wrongfulness of their acts?

"A. Yes, I believe so."

We will not rejudge the credibility of these witnesses. *Jackson v. State, supra.*

▪ The defendant's next sufficiency claim merely reasserts the claim that the defendant's actions were neither knowing nor intentional. Further, after recognizing our standard of review for sufficiency claims, the defendant suggests that we adopt the "rational trier of fact" standard of review enunciated in *Jackson v. Virginia*, (1979) 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573. We decline to do so, and under our established standard, the evidence is sufficient to support the verdicts.

### ISSUE II

▪ The defendant raises a constitutional challenge to Ind.Code § 35–41–4–1(b) (Burns 1979), which requires the defendant to establish the defense of insanity by a preponderance of the evidence. We rejected a similar challenge in *Price v. State*, (1980) Ind., 412 N.E.2d 783, 785.

We find no reversible error. The judgment of the trial court is affirmed.

GIVAN, C. J., and DeBRULER, HUNTER and PIVARNIK, JJ., concur.