**Lovette MITCHELL, Appellant,**

**v.**

**STATE of Indiana, Appellee.**

**No. 49S00–8812–CR–1022.**

Supreme Court of Indiana.

Aug. 2, 1990.

Belle T. Choate, Choate Visher & Haith, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen. of Indiana, Gary Damon Secrest, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Justice.

A jury trial resulted in the conviction of appellant of Confinement, a Class B felony, and Battery, a Class C felony. She was sentenced to terms of fifteen (15) years and eight (8) years respectively. It further was ordered that the sentences were to run concurrently but consecutively to any parole violations.

The facts are: On January 6, 1988, appellant took her daughter, Melissa, two years of age, to Methodist Hospital where she was seen by a physician who described her as suffering from extensive burns from her waist to the bottom of her feet. Appellant told an emergency room physician that while Melissa was on the "pottie", she (appellant) had filled the bathtub and then left to go downstairs. A few moments later she heard a scream, ran back into the bathroom, and found Melissa lying on her back in the bathtub. She removed Melissa, wrapped her in towels, and called for help. The emergency room physician noted appellant's lack of emotion and apparent lack of concern which also was noted by the plastic surgeon and a psychiatric social worker.

Appellant apparently called a taxi cab to take her daughter to the hospital and told the taxi cab driver that after waiting for an ambulance for half an hour, she had called for a cab, and related to the driver that her child had fallen into a hot bathtub of water. Upon arriving at the hospital, appellant admitted her daughter under the name of

"Misty Baker," gave her own name as "Tammy Baker," and indicated that her address was 7100 Kingsley.

Appellant again identified herself as "Tammy Baker" and gave her address as 7157 Kingsley to Janet Pyatt, a psychiatric social worker. Appellant, upon arriving at the hospital, insisted upon leaving and returning home on the pretense of breast-feeding her baby even though she was told that there were suitable facilities at the hospital to accommodate her. Later it was determined that no calls to 911 were made by appellant and that the address provided by her was a vacant lot.

Sandra Eltzroth of the Marion County Sheriff's Department tried to locate appellant's residence so that she, Detective Gullion, and a caseworker could check on the welfare of the other children. After unsuccessfully trying to locate appellant's residence, Detective Eltzroth dialed a telephone number listed on their report. Upon dialing, a female voice answered and detective Eltzroth asked if she were "Tammy Baker." The female indicated that she was "Tammy Baker," and Detective Eltzroth asked her for directions to her residence so they could talk to her about the burns. At this point, appellant gave another false address to Detective Eltzroth, and she could not explain how to get to her residence. By this time, the police were able to obtain her address through Indiana Bell. They then proceeded to her residence. Upon arriving, she identified herself as "Tammy Baker," and the decision was made to take the other children into custody. Ultimately, appellant admitted her true name in a formal statement.

The record reveals that Melissa was in shock when she arrived at the hospital and had extensive, fourth-degree, full-thickness burns from her groin to her toes. There were no burns to her back, shoulders, neck, or head. Each physician came to the conclusion that the nature of the burns to Melissa was inconsistent with accidental infliction but rather indicated forced immersion in very hot water. Throughout this ordeal, Melissa remained in the hospital for approximately five months, endured several operations, and despite all efforts, her feet had to be amputated.

◼ Appellant first contends that the evidence is not sufficient to support the verdict of the jury. In addressing the issue of sufficiency of the evidence, we will not weigh the facts. *Butler v. State* (1989), Ind., 547 N.E.2d 270; *Case v. State* (1984), Ind., 458 N.E.2d 223.

Appellant argues that the State's evidence fails to show that she was the perpetrator of the crime or that she possessed the requisite mental state. Likewise, appellant argues that the record is devoid of evidence that would support an inference that she acted knowingly or intentionally.

◼ The State must sustain its burden of proof on each element of an offense charged and such elements may be established by circumstantial evidence and the logical inferences drawn therefrom. *Decker v. State* (1988), Ind., 528 N.E.2d 1119. This Court has held that the mere presence at the commission of a crime is not sufficient by itself to support a verdict, but it is a circumstance which a jury may consider in determining a defendant's guilt. *Dorton v. State* (1981), Ind., 419 N.E.2d 1289. Likewise, presence at the scene of a crime in connection with other circumstances tending to show participation in the crime may provide sufficient evidence. *Richards v. State* (1985), Ind., 481 N.E.2d 1093. Finally, the trier of fact may draw reasonable inferences from direct or circumstantial evidence and a guilty verdict may be based on circumstantial evidence alone. *Jones v. State* (1988), Ind., 523 N.E.2d 750.

◼ There were no eyewitnesses to the incident. The State called as its first witness, Dr. Howard Levitin. Dr. Levitin testified that he is an emergency room physician and was on duty when Melissa was brought in. He stated that she was in shock and had severe burns from her feet to her waist. He testified that appellant told him that she poured water into the bathtub, left to feed her baby, and shortly thereafter heard Melissa scream. She then told him that she ran back to the bathroom and found Melissa lying on her back. He

testified that, after he talked with appellant, he went back to Melissa to make sure that he was not missing any burns on her back or the back of her head. He indicated that there were no burns to her back or to the back of her head. In addition, he testified that his records indicated that the bathtub was half filled at the time of the incident. He further testified that as an emergency room physician he had seen cases involving children which included both intentional and unintentional burns.

Doctor Levitin indicated that he uses a number of factors in diagnosing intentional water burns:

"I would say the number one thing that I use is that history is incompatible of physical findings, meaning what they tell me happened and what you see in the body do not coincide, that would be number one. Number two, I look at the symmetry of the burn. It's very (Unintelligible) how child abuse burns are reported, one extremity, his burn, will look exactly like the other side, so both sides are very symmetrical. The third thing would be, burning of the soles of the feet and the palms of their hand are extremely rare in accidental burns but are very common in submersion burns. So that would be the third thing. And then the fourth thing would be, does the history compatible with the developmental stage of the child, meaning, a child who is too young to walk would not be expected to be able to climb into, say, for example, a bathtub, to cause his injury or is not old enough to reach out and grab a pot of hot water off the stove. So you look at the developmental age and also is that compatible with the history. And I'd say the last thing would be the demarcation of the lines, the burn lines, meaning, classically reported as an abusive burn is that you'll see a line where the burn occurs and a clear line where the burn stops. That is very classically defined as an abusive burn where often the literature will describe an accidental burn as you'll see a blurring of that margin, it's not such a clear separation between the two."

Further Dr. Levitin indicated that water at a temperature between 140 to 150 degrees would cause full-thickness burns to a child within seconds. He also noticed lack of splash marks elsewhere on her body. Doctor Levitin's opinion was that the burns were not the pattern of an accidental burning but were consistent with an abusive burn or forced immersion.

The State next called Dr. Tom Williams, a pediatric critical care physician, who examined Melissa. Dr. Williams noted severe burns on her lower extremities, hands, and wrists. He testified that there was a very clear line between the burned and unburned skin. He further testified that:

"Burns such as Melissa had, that is, that she had deep burns that were, seemed to be a very uniform depth, that are symmetrical or equal from one side to the other, have a very clear line of demarcation between burned and unburned areas usually do not occur accidentally, that's in—in literature thought to be a sign that is consistent with an inflicted burn."

Dr. Williams also indicated the lack of splash burns on Melissa which he testified were common to an accidental burn. His opinion that it was not an accidental burn was based in part on his experience and in part on consulting relevant literature.

On cross-examination, he testified that Melissa was probably held by the shoulders or upper arms, had her buttocks forced down against the tub, and had her hands down trying to support herself. He further testified that water temperature at 140 degrees would take approximately three to five seconds to exhibit full-thickness burns.

The third witness for the State was Dr. Steven Nugent, a pediatric critical care physician, who also examined Melissa. He testified as to her burns as follows:

"The history's that of an accidental burn and the characteristics of an accidental burn are different from that of an intentional immersion burn, an accidental burn is characterized by splash marks, uneven distribution of the burns, in the sense of being a symmetric, varying

depths of the burn, that was not the case with this burn. This burn was symmetrical on the hands and forearms, this burn was symmetrical on both legs, the burn was deep, essentially all the burn were deep and that is extraordinary uncharacteristic for an accidental immersion burn in tap water."

He testified that it is extremely uncommon for an unrestricted child to sustain full-thickness burns accidentally. Dr. Nugent also indicated that Melissa's position in the tub would be that of her legs totally outstretched, bent at the waist, and with both hands and certain degrees of the forearm outstretched and in the water. He concluded by saying that a child would suffer full-thickness burns in 140 degree temperature in a matter of seconds.

Finally, Dr. Charles Zollman, a plastic surgeon, testified for the State. Upon arriving at the emergency room, he testified that he immediately noticed that she was badly burned. Upon discussing her status with the other physicians, he testified that she was in need of an escharotomy which was to release the tightness of the skin so that it would not constrict the blood flow to her lower extremities. Melissa had a total of nine surgeries but lost both of her feet due to the lack of blood supply to them. He concluded:

"Well first of all, on a lower extremity to get circumferential burns all the way around, not just one leg but two, seems unlikely that a splash would completely do that because it's something that had to completely immerse both of those extremities."

Dr. Zollman testified that Melissa had third-degree burns which means that all the skin was burned and that she had full-thickness burns from her toes to her groin. He also testified that appellant's story that she found her lying on her back was not consistent because of the lack of burns on her back. His opinion was that her legs were immersed and she was bent severely at the waist with her bottom insulated by the qualities of the tub which could have spared her buttocks.

The record further reveals that appellant admitted that she was present at the scene. Appellant also changed her explanations as to how the incident occurred which is not consistent with the nature of the injuries to Melissa. Throughout this ordeal, appellant showed lack of emotion and concern for her daughter's injuries. The record also reveals that Richard Gates, commanding officer of communications, testified that there were no calls from appellant to the 911 emergency number despite her claim that she did call. In addition, Dawn Fishback, a tape-research analyst for the Indianapolis Police Department, testified that, at Detective Mark Gullion's request, she searched all dispatch lines, and she found no calls were made by appellant. Finally, the record reveals that appellant provided the hospital and authorities throughout this ordeal with a false name and address and refused to identify herself when authorities went to her house.

The evidence, as recited above, was sufficient to enable a reasonable trier of fact to find that appellant was the perpetrator of the crime.

Appellant also claims there was insufficient evidence to support the claim that she possessed the requisite mental state.

Intent is a mental state of the actor, and as such, the trier of fact must resort to reasonable inferences based upon examination of the surrounding circumstances to determine intent. *Stanley v. State* (1988), Ind., 531 N.E.2d 484; *Stout v. State* (1988), Ind., 528 N.E.2d 476. Circumstantial evidence is sufficient if an inference may reasonably be drawn from that evidence which supports the verdict. *Brooks v. State* (1986), Ind., 497 N.E.2d 210. The element of "knowingly," like "intentionally," involves a mental state, and as such, may be inferred from the surrounding circumstances. *Norris v. State* (1981), 275 Ind. 608, 419 N.E.2d 129.

The record shows circumstances surrounding the injuries inflicted on Melissa upon which a jury could infer an intentional or knowing mind on the part of appellant. The record reveals appellant's state of mind where she provided a false name and

address to the hospital and law enforcement officers and her lack of concern or emotion involving Melissa's injuries. Therefore, the jury could infer that she knowingly or intentionally committed the offense.

Appellant finally contends the trial court's admission of photographs of the injuries sustained by Melissa constitutes fundamental error.

■ It is well settled that a trial court has wide discretion in determining the admissibility of photographic evidence and will not be disturbed absent a showing of abuse of discretion. *Wesby v. State* (1989), Ind., 535 N.E.2d 133. The mere fact that photographs depict a gruesome, revolting, or inflammatory scene is insufficient, alone, to render them inadmissible if they are otherwise relevant and material. *Id.; Patel v. State* (1989), Ind., 533 N.E.2d 580. The defendant must show that the improper influence of the photographs on the jury outweighs their probative value to an extent that they are unduly prejudicial. *Schweitzer v. State* (1989), Ind., 531 N.E.2d 1386. Photographs which demonstrate a witness's testimony are generally admissible. *Id.*

■ In the present case, the State put into evidence eight photographs of Melissa for the purpose of depicting the nature and extent of her burns as testified to by the physicians. Here, the nature and extent of the burns to Melissa were highly relevant especially because appellant's versions of the incident were not consistent with the injuries received. In addition, they were highly relevant because they depicted the nature and extent of the burns and as such provided the evidence from which the various physicians determined the injuries were inflicted intentionally and not accidentally. The probative value of the pictures outweighs their prejudicial impact. It was not error, fundamental or otherwise, to admit the photographs into evidence.

The trial court is affirmed.

SHEPARD, C.J., and PIVARNIK and DICKSON, JJ., concur.

DeBRULER, J., dissents with separate opinion.

DeBRULER, Justice, dissenting.

The trier of fact was warranted in concluding that appellant lied when describing the manner in which her child was burned and that she sought to hide her conduct. The trier of fact was further warranted in concluding that appellant held the child in her hands and that she immersed the child into the bath tub which was half-filled with scalding hot water and held her there from 1 to 5 seconds. A five-second period of time is commonly accepted to be the time it takes to say the words, "one thousand one, one thousand two, one thousand three, one thousand four, one thousand five," at a normal rate. The trier of fact was not warranted in concluding from the evidence presented and the inferences to be drawn therefrom, to a moral certainty beyond a reasonable doubt, that appellant did these things with the criminal intent charged, that is, with an intent to "substantially interfere with the liberty" of the child, I.C. 35–42–3–1, or to touch her "in a rude, insolent, or angry manner," I.C. 35–42–2–1. Proof of a lack of ordinary care or proof of reckless conduct, i.e., conscious disregard of harm that might result or engaging in conduct which has a tendency to result in harm, is insufficient. *Luther v. State* (1912), 177 Ind. 619, 98 N.E. 640; *Denman v. State* (1982), Ind.App., 432 N.E.2d 426. I vote to reverse.