**Michael L. MOLER, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 39A04–0206–CR–272.**

Court of Appeals of Indiana.

Jan. 30, 2003.

Steven T. Williams, Madison, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Michael Gene Worden, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Judge.

Appellant-defendant Michael L. Moler appeals his conviction for Murder,[1] a felony, challenging sufficiency of the evidence. Specifically, Moler argues that his conviction may not stand because no witnesses testified that Moler was sane during the commission of his crime. Because we are constrained by our supreme court's holding in *Barany v. State,* we affirm.

### FACTS

The facts most favorable to the verdict are that Moler was living with Neil Wright and Neil's mother, Nina Wright. Both Neil and Nina knew that Moler had schizophrenia, but both also knew that Moler functioned normally while on medication. Six months prior to the murder, Nina's mother, Ethel Cummins, moved into Nina's residence. Moler helped care for the elderly Cummins, and Neil and Nina trusted him to care for her.

On the morning of January 6, 1998, Jean Sarver and her husband dropped Moler off at Lifespring Mental Health Services for an injection of anti-psychotic medication. During the drive, Moler appeared normal and spoke with the Sarvers as usual. The Sarvers then drove to their shop, not far from Lifespring. After Moler received his medication, he walked to the Sarver's shop, whereupon Mr. Sarver drove Moler home.

That afternoon, Moler picked Neil up from work and drove him home. Moler, Neil, and Cummins spent the afternoon watching television. During this time, Moler appeared fine and behaved normally. When Neil and Nina had to run an errand that evening, they left Cummins in Moler's care.

Upon returning, however, Neil and Nina found Cummins lying next to the couch with blood everywhere. When Moler, standing at the kitchen sink, shirtless, saw Neil, he said, "I didn't mean to do it. She's a witch. She turned into a witch." Tr. p. 145. Neil hit Moler, who ran out of the house. Neil called for an ambulance,

1. Ind.Code § 35-42-1-1.

which soon arrived. Police officers also appeared on the scene. Cummins was transported to a hospital.

After the ambulance left, Officer Keith Hartman of the Jefferson County Sheriff's Department was speaking with Indiana State Trooper George True. Moler approached the officers. Officer Hartman noticed that Moler was shirtless, had stains on his jeans, and had scratches on his knuckles and hands. Moler told the two officers that he had "just killed that woman." Tr. p. 87. Moler then told the officers that "she had turned into a witch and that he twisted her head around and killed her." Tr. p. 87. Madison Police Captain Daniel Stephan, who knew Moler and was also at the scene, heard his name being called by Moler. Captain Stephan walked to where Moler, Officer Hartman, and Officer True were standing. Moler went on to tell Captain Stephan that he had killed a witch. Tr. p. 181. At that point, Officer Hartman called a crime scene investigator.

Captain Stephan drove Moler to the Jefferson County Sheriff's Department. During the drive Moler appeared normal. Moler then began telling Captain Stephan how he attacked Cummins, though Captain Stephan repeatedly told Moler that Moler did not have to speak. After arriving at the Jefferson County Sheriff's Department, Moler was read his *Miranda* rights and signed a waiver form. Moler told Chief Deputy Sheriff Steve Henry that Cummins's hair "stood straight up." Tr. p. 212. Moler then "went over and started to twist her head around." Tr. p. 212. While he was doing this, "she turned into a witch, so he had to go ahead and kill her then." Tr. p. 212.

The State initially charged Moler with attempted murder and aggravated battery. However, Cummins died six days after the attack. As a result, the State amended the information and charged him with murder. On March 18, 1998, Moler filed a notice of an insanity defense. On May 19, 1998, the trial court found Moler competent to stand trial. Moler was tried three times: the first verdict of guilty but mentally ill was vacated by the trial court as a result of juror misconduct; the second trial commenced but was terminated due to media coverage, and venue was transferred to Ripley County; the third trial, held in Ripley County, ended with a hung jury.

A fourth trial began on February 19, 2002. Prior to trial, the court had appointed two mental health professionals to evaluate Moler's mental state. At trial, Dr. Don A. Olive—who met with Moler several times—testified that "as a result of [the] mental disease [Moler] was unable to appreciate the wrongfulness of his conduct." Tr. p. 557–58. Dr. Rodney Deaton testified, after interviewing Moler and reviewing Moler's medical records, that Moler was insane at the time of the killing. Tr. p. 641–42.

Even though both experts testified that Moler could not grasp the unlawfulness of his acts, Moler's account to police regarding a "witch" remained consistent, and the forensic evidence showed that Cummins's head had indeed been "twisted," Moler was found guilty but mentally ill of both murder and aggravated battery. The trial court merged the aggravated battery conviction with the murder conviction. Moler was sentenced to the Department of Correction for fifty-five years, three of which were suspended. He now appeals.

## DISCUSSION AND DECISION

Moler argues that his conviction may not stand because the State presented no evidence demonstrating that he was sane at the time of the crime. Specifically, Moler notes that while both expert witnesses testified that he was mentally ill at the time

he killed Cummins, the State was unable to present witnesses to testify about his mental state *at the time* he committed the crime.

We first note that Moler never denied actually striking and killing Cummins. Rather, Moler's theory of defense was that he was insane at the time of the offense, thereby vitiating his culpability. For his insanity defense to succeed, Moler had to prove by a preponderance of the evidence that "as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense." Ind.Code § 35–41–3–6(a); *Robinette v. State*, 741 N.E.2d 1162, 1167 (Ind.2001).

■ In addressing Moler's claim that the evidence was insufficient to support his conviction, we neither reweigh the evidence nor assess the credibility of the witnesses. *Brasher v. State*, 746 N.E.2d 71, 72 (Ind.2001). Rather, we look to the evidence most favorable to the verdict and the reasonable inferences therefrom. *Id.* A defendant who appeals a verdict rejecting the defense of insanity must demonstrate that "the evidence was without conflict and led only to the conclusion that the defendant was insane when the crime was committed." *Robinette*, 741 N.E.2d at 1167. Furthermore, the jury may discount the testimony of experts in determining whether the defendant was insane at the time of the crime and rely on the testimony of lay witnesses. *Id.*

The facts of this case are remarkably similar to those in *Barany v. State*, where our supreme court upheld a conviction notwithstanding unanimous expert opinion that the defendant was insane at the time he killed his live-in companion. 658 N.E.2d 60, 64 (Ind.1995). In *Barany*, neighbors saw the defendant, naked, sitting on the end of a pier. Barany's live-in companion, Judith Tomlinson, placed a blanket on Barany, whereupon Barany bit Tomlinson's finger off. Tomlinson quickly ran back into her house. After a short while, Barany followed Tomlinson into the house and discovered that she was on the phone. He shot her eight times, used a splitting maul to destroy household appliances, and struck Tomlinson's body with the maul. At trial, three court-appointed psychiatrists testified that at the time of the murder, Barany was unable to understand the wrongfulness of his conduct. However, a police detective testified that a few hours after the crime, Barany told him that the victim nagged and complained. One of Barany's friends testified that Barany "seemed O.K." to him. *Id.* at 64. Barany's sister testified that Barany had related to her that he believed Tomlinson was calling the police when he killed her. The jury found Barany guilty but mentally ill. On direct appeal, our supreme court upheld the conviction, finding that "the jury could have decided that [the lay] testimony about [Barany's] behavior was more indicative of his actual mental health at the time of the killing than medical examinations." *Id.*

Here, as in *Barany*, the medical experts unequivocally testified that Moler was insane at the time he killed the victim. Tr. p. 557–58, 641–42. However, lay witnesses testified about Moler's behavior before the crime occurred. Neil testified that Moler "seemed to be fine" during the afternoon of January 6, 1998. Tr. p. 134. Nina testified that she saw nothing unusual in Moler's behavior the afternoon before the murder occurred. Tr. p. 261. Jean Sarver testified that her conversation with Moler was normal during the morning drive to Lifespring. Tr. p. 493. Sheri Goode, who gave Moler the injection at Lifespring, testified that "every time" a patient came for a shot, the patient was asked questions about suicidal or homicidal

ideas. Tr. p. 479. Goode also testified that nothing unusual was detected during Moler's January 6, 1998 visit. Tr. p. 480.

Lay witnesses also testified about Moler's demeanor following the attack on Cummins. Captain Stephan, who had known Moler for twelve years, testified that Moler seemed "pretty normal" after the attack. Tr. p. 189. Officer Hartman testified that Moler's general demeanor was "very calm, very relaxed" except for Moler's anxiety about not being allowed into the Wright residence to retrieve some cigarettes. Tr. p. 91. Officer True observed that Moler's demeanor remained calm while Moler told him about how he killed Cummins. Tr. p. 120.

While both medical experts concluded that Moler could not appreciate the wrongfulness of his conduct at the time of the crime, we are forced to follow the rule enunciated by our supreme court in *Barany*. Because lay witnesses testified to his normal demeanor before and after the crime, "the jury could have decided that [the lay] testimony about [Moler's] behavior was more indicative of his actual mental health at the time of the killing than medical examinations." *Id.* Consequently, we are compelled to hold that sufficient evidence was presented to convict Moler of murder.

Our holding notwithstanding, we note that *Barany* has made it very difficult even for defendants with well-documented mental illnesses to successfully raise the insanity defense. Under the rule of *Barany,* even if all expert testimony regarding a defendant's state of mind points to the fact that the defendant could not have appreciated the wrongfulness of his actions *at the time of a crime,* the jury is free to disregard the experts' opinions in favor of lay evidence of the defendant's demeanor before and after the crime.

While the jury is the ultimate finder of fact, we fail to see how evidence of a defendant's demeanor before and after a crime can have much probative value when a schizophrenic defendant is involved. Persons that suffer from schizophrenia can experience unpredictable delusions and hallucinations. Am. Psychiatric Ass'n, *DSM–IV: Diagnostic and Statistical Manual of Mental Disorders* 274–75 (4th ed.1994). A delusion is "a false belief based on incorrect inference about external reality that is firmly sustained despite what almost everyone else believes and despite what constitutes incontrovertible and obvious proof or evidence to the contrary." *Id.* at 765. A hallucination involves "a sensory perception that has the compelling sense of reality of a true perception but that occurs without external stimulation of the relevant sensory organ." *Id.* at 767.

During Moler's attack on Cummins, he "saw" her turn into a witch, according to several lay witnesses who related what Moler told them. Tr. p. 87, 121, 184. Witnesses also testified that Moler told them he had "heard" some one tell him to "kill her and to send her home." Tr. p. 121, 184. Both court-appointed psychiatrists testified that Moler could not appreciate the wrongfulness of his conduct at the time of the attack. Tr. p. 557–58, 641–42. Although Neil and Nina testified to his apparent normality before the murders, the stark fact remains that his schizophrenia required periodic injected anti-psychotic medication, and he had just received such an injection the morning of the day the murder took place. Under these facts and circumstances, it is difficult to escape the conclusion that Moler suffered an unexpected and unpredictable hallucination and delusion at the time he attacked Cummins. It seems that Moler had a "firmly sustained" belief that Cummins was a witch from which he needed to

protect himself. Am. Psychiatric Ass'n, *supra,* at 765. It also appears that what he saw before he attacked Cummins had a sufficient "compelling sense of reality" to cause him to use physical force against Cummins. *See id.* at 767. Indeed, even after the attack, Moler did not recant his statement that Cummins had turned into a witch. Tr. p. 184.

The proposition that a jury may infer that a person's actions before and after a crime are "indicative of his actual mental health at the time of the" crime is logical when dealing with a defendant who is not prone to delusional or hallucinogenic episodes. However, when a defendant has a serious and well-documented mental disorder, such as schizophrenia, one that causes him to see, hear, and believe realities that do not exist, such logic collapses. In the interests of justice, we hope that our supreme court will revisit this rule.

Judgment affirmed.

RILEY and MATHIAS, JJ., concur.