# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**JAMES D. CRUM**
Coots, Henke & Wheeler, P.C.
Carmel, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**NICOLE M. SCHUSTER**
Deputy Attorney General
Indianapolis, Indiana

**FILED**
Mar 20 2012, 9:26 am

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

LUKE KEYS CARSON,                )
                                 )
    Appellant-Defendant,         )
                                 )
        vs.                   )    No. 29A04-1106-CR-278
                                 )
STATE OF INDIANA,                )
                                 )
    Appellee-Plaintiff.          )

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable Steven R. Nation, Judge
Cause No. 29D01-0904-FA-45

**March 20, 2012**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

Luke Keys Carson entered a woman's trailer without permission and left. Later that day, he returned and cut her hand with a knife. He also fought with another man and poked him in the abdomen with the knife. The State charged Carson with two counts of attempted murder, two counts of battery by means of a deadly weapon, burglary, and resisting law enforcement. Carson filed a notice of insanity defense. Carson was found incompetent to stand trial and was diagnosed with paranoid schizophrenia. When he was restored to competency, a bench trial was held. Two experts found that Carson was mentally ill and, as a result of that mental illness, he was unable to appreciate the wrongfulness of his conduct at the time of the crimes. The trial court found Carson not guilty of the two counts of attempted murder. As to the remaining counts, the trial court found, based on Carson's demeanor during and after the crimes, that Carson was able to appreciate the wrongfulness of his conduct at the time of the crimes, thereby rejecting Carson's insanity defense. The trial court found him guilty but mentally ill of two counts of battery by means of a deadly weapon, burglary, and resisting law enforcement.

On appeal, Carson argues that the trial court erred in rejecting his insanity defense because the evidence is without conflict and leads only to the conclusion that he was unable to appreciate the wrongfulness of his conduct at the time of the crimes. In the alternative, he argues that the evidence is insufficient to support his burglary conviction.

We conclude that the evidence of Carson's demeanor during and after the crime supports the trial court's determination that he was able to appreciate the wrongfulness of

actions at the time of the crimes and therefore was guilty but mentally ill.  We also find that the evidence is sufficient to support his burglary conviction.  We therefore affirm his convictions.

### Facts and Procedural History

In the spring of 2009, Carson lived in a Westfield trailer park.  Angelina Zuniga lived in the same trailer park, but the two were not acquainted.  On the morning of April 16, 2009, Zuniga was in her trailer home eating breakfast when she heard someone opening her unlocked door.  She turned and saw an unknown man, later determined to be Carson, standing a couple feet inside her trailer.  He was holding a black Bible and some paper and spoke to her in English, which she did not understand.  After a couple minutes, Carson said "never mind" and left.  Tr. at 64.  Zuniga locked the door.

Thirty to forty-five minutes later, Carson returned to Zuniga's trailer and tried to open the door.  Zuniga was in her trailer with a friend.  When Zuniga saw Carson at the door, she went to the door, opened it, and asked what he wanted.  As she stood in the doorway, Carson again spoke to her in English, and she asked him in her "broken English if he had any problems." *Id*. at 70.  Carson came toward Zuniga and cut her right hand with a knife.[1]  Zuniga went back inside and yelled to her friend to close the door.  Zuniga and her friend struggled to close the door as Carson pushed from the outside.  Zuniga and her friend got the door closed, and Carson walked away.  Zuniga saw Carson hit the window of a blue car as he

---

[1]  The "Sheridan EMS Field Report SOR/Life Line" describes Zuniga's injury as "a superficial defensive laceration to her right hand between her ring and middle finger" with "no active bleeding."  State's Ex. 31.

walked by it. Zuniga also saw Carson walk back and forth between trailers. *Id*. at 74. Later, Zuniga saw that the car window was scratched where Carson had hit it. *Id*. at 73.

That same morning, Jorge Hernandez, who lived in a nearby trailer in the same trailer park, saw an unknown man, later determined to be Carson, walk by his trailer twice. Hernandez went outside to get a better look at who it was. Carson saw Hernandez and asked him if he was "Richard." *Id*. at 29. Carson approached Hernandez and continued to ask him if he was "Richard." *Id*. When Carson came too close, Hernandez pushed him away, and they began to fight. Carson continued to ask Hernandez if he was Richard. During the fight, Hernandez felt something "poking" him in the abdomen. *Id*. Hernandez pulled Carson's jacket over Carson's head and realized that Carson had a knife in his hand. Hernandez backed away from Carson and told him to calm down. Hernandez ran away in fear, and Carson threw the knife at him. When Hernandez realized that Carson no longer had the knife, he turned around and went back toward Carson. Carson retrieved his knife.

At about 10:00 a.m., Westfield Police Officer Joshua Harrell was dispatched to the trailer park. As Officer Harrell pulled into the trailer park, he saw Carson and Hernandez fighting and then voluntarily separate. Officer Harrell got out of his car and saw Hernandez pointing at Carson. "[A]t that point [Carson] started to run and [Officer Harrell] gave chase." *Id*. at 10. During the chase, Officer Harrell commanded Carson to drop the knife. Initially, Carson did not "acknowledge [Officer Harrell] in any way." *Id*. Officer Harrell took out his firearm and yelled that he would shoot Carson if Carson did not drop the knife. Carson dropped the knife near a tree but continued to run until he tripped in some gravel. Officer

4

Harrell put his firearm away and grabbed his taser.  He commanded Carson to show his hands, which were underneath his body.  Carson "kinda turned towards" Officer Harrell, but Officer Harrell "still couldn't see his hands so he deployed his taser." *Id*. at 11.

Westfield Police Officer Greg Marlow arrived to assist.  Officer Marlow saw Carson lying on the ground.  Another police officer asked Carson for his identification, and Carson did not comply.  Officer Marlow spoke briefly to Carson, who asked for an attorney.

Carson was taken to the police department, where he submitted to a recorded interview.  During the interview, Carson repeatedly stated that Isaac, from the movie *Children of the Corn*, would kill kids and drag them to the cornfield, and that he, Carson, tried to kill a baby and drag it to a cornfield like Isaac in *Children of the Corn*.  State's Ex. 33-A.[2]  He repeatedly stated that what Isaac did was "insane," "crazy," and "stupid," and that he, Carson, was not insane.  *Id*.  But he also repeatedly said that he was doing "stupid stuff" that Isaac would have done.  *Id*.  He repeatedly stated that he was going to "slice" or "cut" a "kid" or a "baby" because that is what Isaac would have done, but "[he] couldn't do that, [he] couldn't stab a baby." *Id*.  He mentioned several times that there were black birds that were driving him crazy.  Carson also stated that "they" sent him texts and referred to "the little trick they played about looking up this stuff." *Id*.  He said that he had to go back to the Bible days for "*Children of the Corn* stuff," and "I just know how to read good and figure stuff out … that's why they made me do it." *Id*.  He said, "They told me my name was Luke, and it all

---

[2]  The record before us includes both a VHS tape and a DVD of Carson's recorded interview. However, the DVD was cracked in two.  State's Ex. 33.  Fortunately, we were able to view the VHS tape. State's Ex. 33-A.

came down to me and my bloodline. I started to look through stuff and it did. I'm in the Bible for some reason. I don't know why. I'm an atheist." *Id.* Carson did remember fighting with Hernandez. Carson said that he fought Hernandez because he thought Hernandez was calling the police. Toward the end of the interview, Carson said that he thought he cut the baby. Finally, he said that he wanted to talk about the "big picture" and that he needed "the pieces of paper and the Bible" to show the police. *Id.*

On April 17, 2009, the State charged Carson with two counts of class A felony attempted murder, two counts of class C felony battery by means of a deadly weapon, one count of class B felony burglary, and one count of class D felony resisting law enforcement. On April 24, 2009, Carson filed a notice of insanity defense and a notice of incompetency. On April 27, 2009, the trial court entered an order appointing two psychiatrists, Drs. Martin Groff and Ned Masbaum, to examine Carson to assess his competency to stand trial and determine whether he was insane at the time of the crimes; that is, whether he had a "severely abnormal mental condition that grossly and demonstrably impair[ed his] perception" and rendered him "unable to appreciate the wrongfulness of his conduct at the time of the [alleged] offenses." Ind. Code § 35-41-3-6.

Dr. Groff and Dr. Masbaum independently examined Carson on May 2 and 6, 2009, respectively. On May 7, 2009, the doctors performed a joint examination of Carson, lasting seventy-five minutes. Both doctors reviewed the probable cause affidavit. Dr. Groff also reviewed Carson's jail records. Dr. Groff's report indicated that on April 21, 2009, Dr. Brett Presley described Carson's thinking as "delusional and grossly disorganized" and prescribed

6

Thorazine.[3] Def.'s Ex. B at 4. On May 6, 2009, Carson was put in a padded cell because he was hitting his head against the wall and had tried to put a plastic bag over his head. *Id*. Dr. Groff concluded that Carson had a psychiatric disorder that substantially disturbed his thinking and rendered him incompetent to stand trial. However, due to Carson's confused mental state at the time of the exam, Dr. Groff was unable to determine whether Carson had a severely abnormal mental condition that rendered him unable to appreciate the wrongfulness of his conduct at the time of the alleged offenses. *Id*. at 7.

In his report, Dr. Masbaum diagnosed Carson with a psychotic disorder and concluded that Carson was mentally ill as defined by Indiana Code Section 35-36-1-1[4] and that he was not competent to stand trial at that time.[5] Def.'s Ex. A. at 4. Dr. Masbaum was also unable to assess Carson's soundness of mind at the time of the alleged offenses due to his

---

[3] Thorazine is a brand name for Chlorpromazine.

> Chlorpromazine is used to treat the symptom of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions) and other psychotic disorders (conditions that cause difficulty telling the difference between things or ideas that are real and things or ideas that are not real) and to treat the symptoms of mania (frenzied, abnormally excited mood) in people who have bipolar disorder (manic depressive disorder; a condition that causes episodes of mania, episodes of depression, and other abnormal moods).

PUBMED HEALTH, U.S. NATIONAL LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000553/ (last visited Feb. 8, 2012).

[4] "'Mentally ill' means having a psychiatric disorder which substantially disturbs a person's thinking, feeling, or behavior and impairs the person's ability to function; 'mentally ill' also includes having any mental retardation." Ind. Code § 35-36-1-1.

[5] Dr. Masbaum described Carson's speech as extremely disorganized and called it a "word salad." Def.'s Ex. A. at 3.

"disordered mental state" and opined that it would be necessary to reexamine Carson after he was restored to competency to stand trial. *Id.*

On May 29, 2009, the trial court held a hearing on Carson's competency to stand trial and found that he was not competent.[6] The trial court continued the cause and committed Carson to the Indiana Division of Mental Health and Addiction. Carson was then admitted to Logansport State Hospital, where he was diagnosed with paranoid schizophrenia. Def.'s Ex. G. After ninety days, Carson had not attained competency to stand trial, and Logansport requested a ninety-day extension.[7] Appellant's App. at 49. After the ninety-day extension, Carson still had not attained competency to stand trial, and on November 13, 2009, Logansport initiated involuntary commitment proceedings.[8] On November 16, 2009, the trial court held a hearing on Carson's involuntary commitment. The trial court found that Carson

---

[6] The standard of competency to stand trial is whether the defendant "'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding–and ... has a rational as well as factual understanding of the proceedings against him.'" *Corcoran v. State*, 820 N.E.2d 655, 659 (Ind. 2005) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

[7] Pursuant to Indiana Code Section 35-36-3-3, the superintendent of the state institution to which the defendant is committed is required to certify that "the defendant has *a substantial probability* of attaining the ability to understand the proceedings and assist in the preparation of the defendant's defense *within the foreseeable future*." (Emphasis added.) Our review of the record before us shows that the superintendent merely certified that Carson had not yet attained the ability to understand the proceedings and assist in the preparation of his defense and requested a ninety-day extension. Appellant's App. at 4, 49. Likewise, the August 7, 2009, comprehension to stand trial report submitted by the Logansport doctor who examined Carson failed to provide an assessment on whether it was substantially probable that Carson would attain competency in the foreseeable future. Def.'s Ex. G. Carson has not raised this as an issue, but we are troubled by Logansport's noncompliance with Section 35-36-3-3.

[8] If a defendant has not attained competency within six months of the defendant's admission to a state institution, the state institution "shall institute regular commitment proceedings under IC 12-26." Ind. Code § 35-36-3-4. The petitioner seeking involuntary commitment "is required to prove by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." Ind. Code § 12-26-2-5.

was suffering from paranoid schizophrenia and was gravely disabled and ordered him committed to Logansport.

On October 25, 2010, Logansport filed a comprehension to stand trial report informing the trial court that Carson was competent to stand trial. The parties submitted an agreed entry requesting the trial court to order Drs. Groff and Masbaum to reexamine Carson to determine whether he had a severely abnormal mental condition that grossly and demonstrably impaired his perception and rendered him unable to appreciate the wrongfulness of his conduct at the time of the alleged offenses. Dr. Groff examined Carson on January 27, 2011, and Dr. Masbaum examined him on February 11, 2011.

On February 28, 2011, a bench trial was held. The doctors' reports were admitted into evidence. Both doctors determined that Carson had a severely abnormal mental condition that rendered him unable to appreciate the wrongfulness of his conduct at the time of the alleged offenses. Def.'s Exs. C and E. Officers Harrell and Marlow testified for the State, and the State submitted the videotapes of the police interviews with Carson and Zuniga and Hernandez's written statement. The trial court found Carson not guilty of the two counts of attempted murder. The trial court found Carson guilty but mentally ill on all the remaining counts. Specifically, the trial court found that

> [Carson] did make statements concerning how the actions were stupid. He apologized. He stopped fighting when he saw a police officer approach him and ran from the police officer and obeyed the police officer's command to drop the knife or he would shoot him. All of those items taken together shows [sic] that he had an appreciation of the wrongfulness of the act that he had just committed.

9

Tr. at 127. The trial court sentenced Carson to an aggregate term of ten years. Carson appeals his convictions.

**Discussion and Decision**

### I. Carson's Ability to Appreciate the Wrongfulness of His Conduct

To sustain a conviction, the State must prove each element of the charged offense beyond a reasonable doubt. Ind. Code § 35-41-4-1(a). Even if the State meets its burden, when a defendant raises the insanity defense, the trier of fact has the additional option of finding the defendant "not responsible by reason of insanity at the time of the crime" ("NRI") or "guilty but mentally ill at the time of the crime" ("GBMI"). Ind. Code § 35-36-2-3. Carson argues that the trial court erred in finding him GBMI rather than NRI. The insanity defense is governed by Indiana Code Section 35-41-3-6, which provides,

> (a) A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense.

> (b) As used in this section, "mental disease or defect" means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct.

The insanity defense is an affirmative defense for which the defendant carries the burden of proof by a preponderance of the evidence. Ind. Code § 35-41-4-1. The defendant must establish both that (1) he or she suffers from a mental disease or defect and (2) the mental disease or defect rendered him or her unable to appreciate the wrongfulness of his or her conduct at the time of the offense. *Galloway v. State*, 938 N.E.2d 699, 708 (Ind. 2010). "A defendant who is mentally ill but fails to establish that he or she was unable to appreciate

10

the wrongfulness of his or her conduct may be found [GBMI]." *Id.* Our supreme court has

set forth our standard of review:

> Whether a defendant appreciated the wrongfulness of his or her conduct at the time of the offense is a question for the trier of fact. Indiana Code section 35-36-2-2 provides for the use of expert testimony to assist the trier of fact in determining the defendant's insanity. Such expert testimony, however, is merely advisory, and even unanimous expert testimony is not conclusive on the issue of sanity. The trier of fact is free to disregard the unanimous testimony of experts and rely on conflicting testimony by lay witnesses. And even if there is no conflicting lay testimony, the trier of fact is free to disregard or discredit the expert testimony.
>
> Because it is the trier of fact's province to weigh the evidence and assess witness credibility, a finding that a defendant was not insane at the time of the offense warrants substantial deference from reviewing courts. A defendant claiming the insanity defense should have prevailed at trial faces a heavy burden because he or she is in the position of one appealing from a negative judgment. A court on review will not reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of fact (even though more reasonable inferences could have been made).
>
> Although this standard of review is deferential, it is not impossible, nor can it be. The Indiana Constitution guarantees "in all cases an absolute right to one appeal." Ind. Const. art. VII, § 6. An impossible standard of review under which appellate courts merely "rubber stamp" the fact finder's determinations, no matter how unreasonable, would raise serious constitutional concerns because it would make the right to an appeal illusory. As such, this Court has long held that where the defendant claims the insanity defense should have prevailed, the conviction will be set aside when the evidence is *without conflict* and leads only to the conclusion that the defendant was insane when the crime was committed.

*Id*. at 709-10 (footnote, citations, and quotation marks omitted).

Here, Drs. Groff and Masbaum both agreed that Carson was mentally ill and, as a

result, was unable to appreciate the wrongfulness of his conduct at the time of the offenses.

There was no lay opinion testimony as to Carson's ability to appreciate the wrongfulness of

11

his conduct. Accordingly, we will consider whether there is demeanor evidence from which a conflicting inference of sanity may reasonably be drawn, and if there is, then we must affirm the trial court. *See id.* at 712 ("Even where there is no conflict among the experts and the lay witnesses, a finding that a defendant was sane at the time of the crime still may be sustained by probative demeanor evidence from which a conflicting inference of sanity may be drawn.")

Our supreme court has explained that demeanor evidence has its strengths and weaknesses. "Demeanor is useful because a defendant's behavior before, during, and after a crime may be more indicative of actual mental health at the time of the crime than mental exams conducted weeks or months later." *Id.* (citation, quotation marks, and brackets omitted). When there is some indication that the defendant is feigning mental illness, demeanor evidence is more "useful." *Id.* at 713. Demeanor evidence is less valuable when the defendant has a history of mental illness with psychosis. *Id.* "Finally, demeanor evidence before and after a crime is of more limited value than the defendant's demeanor during the crime." *Id.* at 714. Our supreme court has emphasized that "demeanor evidence must be considered as a whole, in relation to all the other evidence. To allow otherwise would give carte blanche to the trier of fact and make appellate review virtually impossible." *Id.*

Here, the trial court found that Carson appreciated the wrongfulness of his conduct at the time he committed his crimes based on the following demeanor evidence: (1) Carson stopped fighting and ran when he saw Officer Harrell: (2) Carson dropped his knife when

12

Officer Harrell told him to drop the knife or he would shoot him; (3) during his police interview, Carson described his actions as "stupid;" and (4) Carson apologized.[9] Tr. at 127. Carson contends that the trial court failed to consider the "demeanor evidence as a whole, in relation to all other evidence," *Galloway*, 938 N.E.2d at 714, and that when the demeanor evidence is properly considered, it does not support a reasonable inference that he was able to appreciate the wrongfulness of his conduct at the time of his offenses. In that event, according to Carson, the evidence is without conflict and leads only to the single conclusion that he was unable to appreciate the wrongfulness of his conduct.

In a number of Indiana cases, defendants have appealed their GBMI convictions, claiming that he or she should have been found NRI on the basis of nonconflicting expert testimony that the defendant was unable to appreciate the wrongfulness of his or her conduct at the time of the offense(s). In all these cases, except for *Galloway*, the appellate court upheld the GBMI conviction(s) because the evidence regarding the defendant's ability to appreciate the wrongfulness of his or her conduct was conflicting. For purposes of comparison, we review a few of these cases and then discuss *Galloway*.

In *Barany v. State*, 658 N.E.2d 60 (Ind. 1995), the defendant murdered his girlfriend. He was sitting naked on a pier, and his girlfriend came out of their house and covered him with a blanket. He bit off his girlfriend's finger and swallowed it. She ran into the house.

---

[9] Our review of the record has not revealed the apology to which the trial court refers, and neither party provides a citation to the record for it. However, the sound quality of the VHS tape of Carson's interview was less than perfect, and it is possible that he apologized but we were unable to understand it.

13

Barany went into the water and then went into the house. He saw his girlfriend talking on the telephone, got a handgun, and shot her eight times in the head. Our supreme court held,

> In this case, the medical experts were unanimous in concluding that appellant was insane at the time of the killing. However, the State offered testimony from several lay witnesses that indicated that appellant was sane. Indiana State Police Detective Stotts described how, only a few hours after the crime, appellant talked about the victim's complaints and nagging. One of appellant's friends, Chris Brockman, testified as to unusual topics of conversation, such as conspiracies, but indicated that appellant "seemed O.K." In a conversation with his sister, appellant indicated that he believed that the victim was calling the police when he killed her. The jury could have decided that this testimony about appellant's behavior was more indicative of his actual mental health at the time of the killing than medical examinations conducted four weeks after the arrest. Given this conflicting evidence, we will not invade the jury's fact-finding province.

*Id.* at 64.

In *Moler v. State*, 782 N.E.2d 454 (Ind. Ct. App. 2003), *trans. denied*, the defendant lived with Neil Wright; Neil's mother, Nina Wright; and Nina's mother, Ethel Cummins. Moler helped care for the elderly Cummins. Neil and Nina knew that Moler had schizophrenia. One morning, Jean Sarver took Moler to Lifespring Mental Health Services for an injection of antipsychotic medication. Later, Moler, Neil, and Cummins spent the afternoon watching television. Moler appeared fine and behaved normally. Neil and Nina left Moler with Cummins while they went to run an errand. When they returned, Cummins was lying next to the couch with blood everywhere. Moler told police that Cummins turned into a witch so he had to kill her. The *Moler* court concluded,

> Here, as in *Barany,* the medical experts unequivocally testified that Moler was insane at the time he killed the victim. However, lay witnesses testified about Moler's behavior before the crime occurred. Neil testified that Moler "seemed to be fine" during the afternoon of January 6, 1998. Nina

14

testified that she saw nothing unusual in Moler's behavior the afternoon before the murder occurred. Jean Sarver testified that her conversation with Moler was normal during the morning drive to Lifespring. Sheri Goode, who gave Moler the injection at Lifespring, testified that "every time" a patient came for a shot, the patient was asked questions about suicidal or homicidal ideas. Goode also testified that nothing unusual was detected during Moler's January 6, 1998 visit.

Lay witnesses also testified about Moler's demeanor following the attack on Cummins. Captain Stephan, who had known Moler for twelve years, testified that Moler seemed "pretty normal" after the attack. Officer Hartman testified that Moler's general demeanor was "very calm, very relaxed" except for Moler's anxiety about not being allowed into the Wright residence to retrieve some cigarettes. Officer True observed that Moler's demeanor remained calm while Moler told him about how he killed Cummins.

*Id*. at 457-58 (citations omitted). The *Moler* court held that there was sufficient evidence to support the jury's verdict that Moler was GBMI. *Id*. at 458.

In *Thompson v. State*, 804 N.E.2d 1146 (Ind. 2004), the defendant, who had a history of mental illness, was convicted of residential entry. Thompson went to Alisha Beeler's home to use her bath. Beeler observed Thompson talking strangely to the children. When Thompson went to her car to retrieve some bath items, Beeler locked the door. When Thompson came back, Beeler told her to leave. Thompson became irate and broke the window. She climbed in through the window, collected her things, and departed through the front door. The expert opinions were unanimous that Thompson was insane at the time of the offense. The Court of Appeals found this evidence uncontradicted and reversed Thompson's conviction. However, our supreme court affirmed Thompson's conviction, explaining,

The State contends that non-medical evidence of Thompson's sanity could be gleaned from the affidavit. Specifically, it cites Thompson's removal of only her own possessions from Beeler's home as indicating her awareness of the propriety of taking only what belonged to her and hence her awareness

15

of right and wrong. It further argues that because the officers who stopped Thompson when she was leaving the scene felt comfortable releasing her, they must have felt she was sufficiently lucid to be allowed to go about her business. The Court of Appeals rejected the State's argument, correctly stating that in reviewing the judgment, we review only the reasonable inferences to be drawn from the facts and finding that there were other more reasonable inferences that could be drawn from those facts. *The question, however, is whether the inferences supporting the judgment were reasonable, not whether there were other more reasonable inferences that could have been made.* Reaching alternative inferences such as this is a function of the trier of fact, not this Court. We cannot reverse the conviction merely because this inference is a plausible one that might have been drawn from the evidence.

*Id*. at 1149-50 (citations and quotation marks omitted) (emphasis added).

Our supreme court stated that the "trier of fact was entitled to prefer [the demeanor evidence] over the psychiatric examinations conducted weeks or months later," and that the trial court had provided insight into why he did so. *Id*. at 1150. The trial court cited "Thompson's history of avoiding criminal responsibility through her illness, her conflicting stories about what happened to her medication, her decision to use illegal drugs and drink alcohol while on her medication, and the lies she told one of the examining psychiatrists regarding that use of drugs and alcohol." *Id*. Our supreme court concluded that the evidence of Thompson's insanity was clearly in conflict and "the trier of fact could have found that Thompson was able to distinguish right from wrong." *Id*. *See also*, *e.g.*, *Gambill v. State*, 675 N.E.2d 668, 671 (Ind. 1996) (concluding that evidence of defendant's sanity was conflicting where lay witnesses testified that defendant was able to appreciate the wrongfulness of her actions at the time of offense, defendant failed to tell medical personnel that she took large quantities of methamphetamine before killing her son, and defendant lied to person who found her wandering the streets on the morning after murder when she claimed

she had been beaten and raped and her former boyfriend had hurt her son); *Fernbach v. State*, 954 N.E.2d 1080, 1086 (Ind. Ct. App. 2011) (concluding that evidence of defendant's sanity was conflicting where lay witnesses testified that defendant was acting normally at convenience store where shooting occurred, defendant fled the scene of the crimes, jail nurse testified she thought defendant was faking the extent of his mental illness, and police officers who interviewed defendant after shootings testified they thought he knew the difference between right and wrong), *trans. denied*; *Jones v. State*, 825 N.E.2d 926, 930 (Ind. Ct. App. 2005) (concluding that evidence of defendant's sanity was conflicting where police officer testified that defendant was in "very normal state" when he said he had killed victims, detective testified that defendant's behavior did not cause him to be concerned about defendant's state of mind, and defendant indicated that, before he shot victims, he wrapped gun so that "neighbors wouldn't hear it" because "he had a plan," and after shooting defendant took victim's keys and money, stopped and bought cigarettes and a drink, and drove around looking for "weed"), *trans. denied*.

As noted above, *Galloway* is the only case in which a defendant's GBMI conviction was reversed. In *Galloway*, the defendant murdered his grandmother, with whom he lived. The defendant had a long history of mental illness. He had been diagnosed with bipolar disorder by up to twenty different physicians, often with accompanying psychotic and manic symptoms, and had been voluntarily or involuntarily detained or committed for short-term treatment more than fifteen times.

17

At trial, the experts unanimously agreed that the defendant was insane at the time of the murder. In addition, the opinions of five lay witnesses supported the experts' opinion. Nevertheless, the trial court found the defendant GBMI based on demeanor evidence. On appeal, a majority of our supreme court disagreed, concluding that "there was not sufficient demeanor evidence of probative value from which an inference of sanity could be drawn." 938 N.E.2d at 715.

> [The trial court] found as probative of sanity the fact that, over the course of an hour, the defendant shopped, ate, and filled a car with gasoline without incident. It also found as probative the fact that the defendant cooperated with police after the fact. Viewed in isolation, each of these events may indeed represent the normal events of daily life. However, when viewed against the defendant's long history of mental illness with psychotic episodes, the defendant's demeanor during the crime, as testified to by three eyewitnesses, and the absence of any suggestions of feigning or malingering, this demeanor evidence is simply neutral and not probative of sanity.

*Id.* Further, the *Galloway* court found that the trial court improperly relied on several facts as being indicative of sanity: the absence of plan or motive and the defendant acting without warning; the defendant's deterioration during trial to the point of incompetency to stand trial; the defendant's failure to take medication; and that the defendant was alert and oriented at trial nearly a year after the murder. *Id.* Finally, the *Galloway* court found that it was inappropriate for the trial court to consider the conditions of Indiana's mental health system in rejecting the defendant's insanity defense. *Id.* at 716.

What these cases illustrate is that determining whether demeanor evidence supports an inference of sanity sufficient to create a conflict with nonconflicting expert testimony that the defendant was insane is fact-sensitive and not amenable to a clear-cut standard. In the case at

18

bar, the evidence does not provide any indication that Carson was feigning or malingering, which reduces the value of demeanor evidence. In addition, demeanor evidence is less valuable because Carson was diagnosed as paranoid schizophrenic, a mental illness with delusions and hallucinations.[10] The severity of his illness is shown by the fact that he was not restored to competency to stand trial until a year and a half after he committed the crimes. Although the demeanor evidence is less useful here than it might be for mental illnesses without delusions and hallucinations, Carson did not have a long history of mental illness[11] as did Galloway, so perhaps the demeanor evidence should not be discounted to the extent that it was in *Galloway*.

Let us first consider the evidence relied on by the trial court of Carson's demeanor at the time of the crimes and immediately thereafter. The fact that Carson ran when he saw the police officer supports a reasonable inference that Carson knew that fighting with Hernandez was wrong. The fact that Carson dropped the knife when the police officer threatened to shoot him does not seem quite as probative. Although it indicates that Carson was thinking clearly enough to protect himself, it is not necessarily indicative of an awareness of right and wrong. Nevertheless, we cannot say that drawing an inference of sanity from it is unreasonable.

---

[10] "Persons that suffer from schizophrenia can experience unpredictable delusions and hallucinations." *Moler*, 782 N.E.2d at 458 (citing Am. Psychiatric Ass'n, *DSM–IV: Diagnostic and Statistical Manual of Mental Disorders* 274–75 (4th ed. 1994)).

[11] In fact, the record shows that for about two months before the crime, Carson lived with his invalid grandmother and was able to provide her with complete nursing care. Def.'s Ex. A at 2.

The rest of the demeanor evidence relied on by the trial court concerns events that occurred after the crime. Such evidence may be less valuable than evidence of demeanor during the crime, but it is not meaningless. The record shows that Carson asked Officer Marlow for an attorney. In his recorded interview, Carson stated that he fought Hernandez because Carson thought that Hernandez was calling the police. Carson also described what he had done as "stupid" and "crazy." State's Ex. 33-A. More probative of Carson's state of mind at the time of the crimes are Carson's statements that he tried to do "crazy stuff" that Isaac would have done, but "[he] couldn't do it." *Id*. All support a reasonable inference that Carson knew his conduct was wrong.

Carson claims that the trial court did not consider the demeanor evidence presented by lay witnesses Zuniga and Hernandez. He directs us to Zuniga's testimony that he came into her trailer with a Bible and a piece of paper. He notes that Hernandez thought that his behavior was strange enough to cause Hernandez to come out to investigate, and that Hernandez testified that Carson kept asking Hernandez if he were "Richard." Tr. at 29. We find nothing in the record that would cause us to think that the trial court did not consider all the demeanor evidence. The evidence that Carson highlights indeed supports a finding that he was suffering from a mental illness at the time of the crimes. It does not necessarily indicate that he could not appreciate the wrongfulness of his actions. Therefore, it does not undercut the demeanor evidence that does support a reasonable inference that he was able to appreciate the wrongfulness of his conduct.

Carson ran when he saw a policeman, asked for an attorney, stated that he fought with Hernandez because he thought that Hernandez was calling the police, and stated that he was unable to go through with the stupid, crazy things that he intended to do. We think that considering the demeanor evidence as a whole, in relation to all other evidence, there is probative evidence such that a reasonable inference of Carson's ability to appreciate the wrongfulness of his conduct at the time of the crimes can be drawn. We emphasize that the question before us is whether the inferences supporting the judgment are reasonable, not whether there are other more reasonable inferences that could have been drawn. *See Thompson*, 804 N.E.2d at 1149-50. Here, a reasonable inference that Carson appreciated the wrongfulness of his conduct is supported by the evidence, and therefore the evidence is not without conflict and does not lead only to the conclusion that Carson could not appreciate the wrongfulness of his actions. That being the case, we will not invade the fact-finder's province. *See Barany*, 658 N.E.2d at 64. Accordingly, we affirm the trial court's judgment that Carson is GBMI.

## II. *Sufficiency of the Evidence*

Carson also contends that there is insufficient evidence to support his conviction for class B felony burglary. Our standard of review is well settled.

> When reviewing the sufficiency of the evidence, we neither reweigh the evidence nor judge witness credibility. Instead, we examine only the evidence favorable to the judgment, together with the reasonable inferences to be drawn therefrom. We will affirm the conviction if evidence of probative value exists from which a fact-finder could find the defendant guilty beyond a reasonable doubt.

*Gray v. State*, 797 N.E.2d 333, 334-35 (Ind. Ct. App. 2003) (citations omitted).

Indiana Code Section 35-43-2-1 provides that a person who breaks and enters a dwelling of another person, with intent to commit a felony in it, commits class B felony burglary. "To establish the intent to commit a felony element of a burglary charge, the State must prove beyond a reasonable doubt the defendant's *intent to commit a felony specified in the charge*." *Freshwater v. State*, 853 N.E.2d 941, 942 (Ind. 2006) (emphasis added).[12] To sustain Carson's conviction for class B felony burglary, the State was required to prove beyond a reasonable doubt that Carson "did break and enter the dwelling of Angelina Zuniga; with the intent to commit a felony therein, to-wit; Murder, to intentionally kill an unknown child." Appellant's App. at 12.

Carson had two encounters with Zuniga, but our focus will be on the first because Carson opened Zuniga's door and entered her home without permission. The second time, in contrast, Zuniga opened the door herself. Therefore, only the first encounter satisfies the breaking and entering element of burglary, and Carson concedes as much. *See Thompson v. State*, 692 N.E.2d 474, 477 (Ind. Ct. App. 1998) ("Breaking is proved by showing that even slight force was used to gain unauthorized entry *including opening an unlocked door*."); *see also Henley v. State*, 522 N.E.2d 376, 379 (Ind. 1988) (evidence sufficient to show breaking and entering where defendant entered victim's home by opening unlocked door).

Although Carson concedes that entering Zuniga's trailer without permission is breaking and entering, he initially contends that there is no evidence that he "committed or

---

[12] Where the State cannot establish intent to commit a particular underlying felony, residential entry is the appropriate charge. *See* Ind. Code § 35-43-2-1.5 ("A person who knowingly or intentionally breaks and enters the dwelling of another person commits residential entry, a Class D felony.").

attempted to commit any type of felony." Appellant's Br. at 11. No such evidence was required because the burglary statute does not require the actual commission of or an attempt to commit a felony. *See Blackmon v. State*, 455 N.E.2d 586, 590 (Ind. 1983) (noting that State was not required to prove defendant completed theft to sustain burglary conviction). The burglary statute only requires the State to prove that the defendant *intended* to commit a felony. *See* Ind. Code § 35-43-2-1. The evidence shows that Carson intended to commit a murder in Zuniga's trailer; that is, he told the police that he went to the trailer to kill a baby. Carson contends this evidence is insufficient under the circumstances because he was delusional and the existence of a baby in Zuniga's trailer was part of his delusion. According to Carson, his delusion negates the "intent to commit a felony" element of the burglary statute. The State counters that the "fact that there was no child in [Zuniga's] home or that [Carson] might be delusional does not negate [his] possession of the intent to commit the underlying felony of murder." Appellee's Br. at 14 n.6 (citing *Anez v. State*, 408 N.E.2d 1315, 1317 (Ind. Ct. App. 1980)).

*Anez* dealt with the application of the mistake of fact defense governed by Indiana Code Section 35-41-3-7, which provides, "It is a defense that the person who engaged in the prohibited conduct was reasonably mistaken about a matter of fact, if the mistake negates the culpability required for commission of the offense."[13] "'[I]n order for mistake of fact to be a

---

[13] In *Anez*, the defendant was convicted of burglary after the police saw him with his hands and arms inside a broken restaurant window, and he told police that he used a rock to break the window to get "anything valuable." *Anez*, 408 N.E.2d at 1316. On appeal, Anez argued that his conviction must be reversed because he was mistaken in the belief that he could reach something valuable. The *Anez* court rejected his argument, concluding that "[i]t is obvious through Anez' statement of his intent to get 'anything valuable' from the restaurant that his culpability was not negated by his mistake." *Id*. at 1317.

valid defense, three elements must be satisfied: (1) *the mistake must be honest and reasonable*; (2) the mistake must be about a matter of fact; and (3) the mistake must negate the culpability required to commit the crime.'" *Nolan v. State*, 863 N.E.2d 398, 404 (Ind. Ct. App. 2007) (quoting *Giles v. State*, 699 N.E.2d 294, 300 (Ind. Ct. App. 1998)) (emphasis added), *trans. denied*. Because there is no evidence that Carson was reasonably and honestly mistaken that a baby was in Zuniga's trailer, the mistake of fact defense does not apply here. *See Payne v. State*, 854 N.E.2d 7, 20 (Ind. Ct. App. 2006) ("[T]he mistake of fact defense is available where the defendant, *acting under a reasonable and honest mistake* concerning a fact or facts commits an act which, if the facts were as the defendant believed them to be, would not be criminal.") (emphasis added).

Indeed, Carson does not rely on the mistake of fact defense. Rather, he argues that "an insane delusion is much more than a mistake of fact." Appellant's Reply Br. at 1 (citing *Barr v. Summer*, 183 Ind. 402, 107 N.E. 675 (1915)).[14] In essence, Carson's argument is that his delusions preclude the possession of the requisite mens rea or "guilty mind" when literally translated into English from the Latin. *Id.* at 2. Mens rea is defined as "[t]he state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime; criminal intent or recklessness." BLACK'S LAW DICTIONARY 1006 (8th ed. 2004). We have described mens rea as a "subjective blameworthiness." *Carter v. State*, 408 N.E.2d 790, 797 (Ind. Ct. App. 1980); *see also Markoff v. State*, 553 N.E.2d 194, 196

---

[14] *Barr* dealt with whether the testatrix was of sound mind and possessed full testamentary capacity when she executed her will, so it is not helpful to the resolution of the issue before us.

(Ind. Ct. App. 1990) ("intent is a mental state of the actor"); *Long v. State*, 166 Ind. App. 282, 285, 335 N.E.2d 631, 632 (1975) ("intent is a subjective state of mind").

Carson does not cite any case law in which an appellate court was asked to examine whether a defendant, suffering from delusions caused by mental illness or disease, was found unable to form the requisite criminal intent due to those delusions. Our own review of Indiana case law does not reveal any such cases.[15]

Here, the evidence shows that Carson entered Zuniga's trailer with the intent to kill a baby. Regardless of whether he was deluded as to the actual existence of a baby, he entered her trailer with the subjective intent to commit murder, a felony, as alleged in the charging information. Moreover, in his videotaped interview, Carson repeatedly stated that he was going to "cut" or "slice" a baby but could not do it. State's Ex. 33-A. Those statements show that he was able to appreciate the wrongfulness of the intent to commit murder. Thus, we conclude that Carson's delusions did not preclude the formation of a "guilty mind." Although there may be circumstances under which insane delusions negate the culpability of a defendant's crime,[16] such is not the case here. We conclude that there was sufficient

---

[15] Cases dealing with a defendant's drug-induced delusions and ability to form the requisite criminal intent are not on point. S*ee Norris v. State*, 275 Ind. 608, 614-15, 419 N.E.2d 129, 132-33 (1981) (concluding that there was sufficient evidence for jury to conclude that the defendant, suffering from delusions and paranoia cause by his ingestion of PCP, intended to kill someone, and therefore affirming defendant's conviction for attempted murder based on the doctrine of transferred intent).

[16] For example, in *State v. Herrera*, 993 P.2d 854, 858 (Utah 1999), *cert. denied*, the defendant shot and killed his girlfriend and was charged with murder. The doctor who examined Herrera concluded that when Herrera shot his girlfriend, he was suffering from the delusion, associated with his paranoid schizophrenia, that the Mafia had replaced his girlfriend with a nonhuman double, and therefore, Herrera did not believe that he was killing a human being. Based on the doctor's opinion, the State stipulated that Herrera was not guilty pursuant to Utah's insanity statute. *Id. See* Utah Code Ann. § 76-2-305 ("It is a defense to a prosecution

evidence to support Carson's conviction for class B felony burglary and affirm his conviction.

Concluding that there was sufficient evidence to support the trial court's judgment that Carson was able to appreciate the wrongfulness of his conduct at the time he committed his crimes and that there was sufficient evidence to support his conviction for burglary, we affirm Carson's GBMI convictions.

Affirmed.

MAY, J., and BROWN, J., concur.

---

under any statute or ordinance that the defendant, as a result of mental illness, lacked the mental state required as an element of the offense charged.").