# FOR PUBLICATION

**MARK LEEMAN**
Cass County Public Defender
Leeman Law Offices
Logansport, Indiana

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CYNTHIA L. PLOUGHE**
Deputy Attorney General
Indianapolis, Indiana

FILED

Jan 28 2014, 11:32 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| TAMMY LOU KELLEY, | ) |
| | ) |
| Appellant-Defendant, | ) |
| | ) |
| vs. | ) No. 09A04-1303-CR-98 |
| | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Appellee-Plaintiff. | ) |

APPEAL FROM THE CASS CIRCUIT COURT
The Honorable Leo T. Burns, Jr., Judge
Cause No. 09C01-1103-FA-2

**January 28, 2014**

**OPINION - FOR PUBLICATION**

**ROBB, Judge**

## Case Summary and Issues

Tammy Lou Kelley appeals her convictions, following a bench trial, for criminal confinement, a Class C felony; three counts of battery resulting in bodily injury, Class D felonies; and resisting law enforcement, a Class A misdemeanor. Kelley presents several issues on appeal, one of which we find dispositive: whether the trial court's verdict finding Kelley guilty but mentally ill was contrary to law. Concluding that the trial court's verdict was contrary to law we reverse and remand.

## Facts and Procedural History

On the morning of March 6, 2011, Derrick Shepard left his twelve-year-old daughter, D.S., with Kelley in the apartment that the three of them shared. D.S. was eating breakfast in the living room when Kelley came into the room looking for money and an ID and asked D.S. what she was doing. Kelley then punched D.S. in the face several times, saying that she had had enough of D.S.'s "shit." Exhibit 1 at 6. D.S. pushed Kelley away and at the same time pushed Kelley's hands down. Kelley left the room, grabbed a six-inch steak knife from the kitchen, came back into the living room, and said to D.S., "I can't take this anymore, I've had enough!" and began stabbing D.S. Id. at 2. D.S. was able to get to a phone and call 911 while Kelley continued to stab her, but then D.S. lost the connection to 911. While this was going on, D.S. was moving around the apartment trying to get away from Kelley. At one point, Kelley had D.S. on the floor and was stabbing her, with D.S. holding her arms up so that Kelley could not get to her face. Eventually, D.S. pushed Kelley away so that she could get to the door. Kelley then went into the kitchen again, and D.S. unlocked the door and left.

D.S. ran out of the apartment and first went to the apartment complex main office, which was closed. She then began running again and saw a woman coming out of an apartment. She told the woman, Ashley Goodman, that she had been stabbed and asked her for help. Goodman saw that D.S. was covered in blood and had a "busted" lip—which she specifically noticed after D.S. told her that she had been punched before she was stabbed—and took D.S. into her apartment to call 911. Exh. 2 at 7.

Several officers from the Logansport Police Department arrived on the scene shortly thereafter. Officers Carlos Reynoso and George Franklin arrived at the apartment complex, and as Officer Reynoso walked up to Goodman's apartment, he could see drops of blood on the sidewalk. Later investigation showed a trail of blood leading from D.S.'s apartment to the main office, with "a large amount of blood on the door to the office," and then more blood leading to Goodman's apartment. Exh. 1 at 5. Officers arrived at Goodman's apartment to find D.S. frightened and covered in blood. An ambulance arrived after the officers spoke to D.S., and en route to the hospital the medics requested that life line be available to transport D.S. via helicopter to a different medical center, where the record indicates that D.S. spent at least a couple of days in the Intensive Care Unit. Ultimately, D.S. was found to have suffered nine knife wounds, including wounds on her head and arms, a back wound that just missed her kidney, and a wound on her chest that partially collapsed one of her lungs.

While Officers Reynoso and Franklin were attending to D.S. at Goodman's apartment, Lieutenant Carl Swan and Officer Rick Bernhardt went to D.S.'s apartment to speak to

Kelley. As they approached the apartment, they saw blood stains on the walk leading up to the apartment as well as on the door to the common area. The door to D.S.'s apartment was partially open, and Lt. Swan could see Kelley standing just inside the apartment wearing a white shirt and red pajama pants, with "copious amount [sic] blood stain on Kelley's clothing and body." Id. at 3. Lt. Swan kicked the door open the rest of the way and ordered Kelley to the ground at gunpoint. Kelley initially complied with the order, and the officers came into the living room and noticed blood stains on the carpeting and a blood-stained steak knife with a bent blade lying on the floor about six feet away from Kelley. Lt. Swan handcuffed Kelley while Officer Bernhardt performed a protective sweep of the apartment. Lt. Swan started to Mirandize Kelley, at which point Kelley began to yell "Fuck Off," "I wan't [sic] fucking water," "Give me water," and "I didn't do anything I just need water." Id. The officers requested that Kelley calm down, which she did not do, and when they assisted Kelley to her feet, Kelley became aggressive and kneed Officer Bernhardt in the groin and kicked Lt. Swan in the groin as soon as she stood up. Both men complained of pain and discomfort in the groin area as a result of her strikes. Kelley was taken to the common area of the apartment building where she continued to scream and kick while being held down. Additional officers assisted in securing Kelley for transport, and Kelley was taken to the jail. At the jail, Kelley, still unruly, was taken to a padded cell where her clothing was collected and she was checked for injuries (none were found).

Shepard was interviewed briefly when he came to the police station after learning about the incident between Kelley and his daughter. He explained that he and Kelley had

4

never been married, although she had been in his life before but was not currently his girlfriend. He stated that he knew something was wrong when he left the apartment that morning, and that Kelley had been acting different since coming home from her mother's house that weekend, but that he did not think she was capable of hurting D.S.

On March 9, 2011, the State charged Kelley with: count I, attempted murder as a Class A felony; count II, criminal confinement as a Class C felony; count III, battery of a person under fourteen resulting in bodily injury as a Class D felony; count IV, battery of a law enforcement officer (Officer Bernhardt) resulting in bodily injury as a Class D felony; count V, battery of a law enforcement officer (Lt. Swan) resulting in bodily injury as a Class D felony; and count VI, resisting law enforcement as a Class A misdemeanor. In June 2011 Kelley filed a motion for psychiatric, competency, and mental status evaluation, which the court granted in July 2011.

Two psychiatrists filed reports with the court after evaluating Kelley. Dr. Rebecca Mueller saw Kelley on July 13, 2011, and also reviewed the charging information and probable cause affidavit, police reports, and Kelley's mental health records from the jail as well as from the Four County Counseling Center ("FCCC"). During the interview, Kelley told Dr. Mueller that she and D.S. had gotten "into a scuffle." Exh. A at 2. She told Dr. Mueller that she had had an argument with Shepard that morning and at some point he had called off their engagement.[1] She wanted him to take D.S. to her brother's place that day rather than leaving her at the apartment, but he refused. Kelley did not remember the details

---

[1] There appear to be conflicting stories as to the status of Kelley's and Shepard's relationship.

of the incident but did remember grabbing a knife and stabbing D.S., although she also said that she "would not have stabbed D.S. in one million years." Id. Dr. Mueller commented that Kelley spoke very little about the stabbing but remarked that Shepard "knew what would happen and should have taken D.S. out of the apartment instead of leaving for work." Id. Dr. Mueller noted that Kelley did not express remorse or concern over the trauma she had caused, which Dr. Mueller found odd, and that Kelley seemed oblivious that her actions had been life-threatening. Kelley talked with Dr. Mueller about hearing voices and being paranoid, and Dr. Mueller believed that Kelley was hearing voices during the interview despite Kelley's denial of any auditory hallucinations. Dr. Mueller's review of Kelley's FCCC records revealed mental health treatment dating back to 2004. In 2008 Kelley required a psychiatric consult after having been brought into an ER when police found her naked in the snow. She was diagnosed with bipolar disorder, severe with psychotic features. In 2010 FCCC again saw Kelley for intake, and during intake Kelley discussed her legal issues and two suicide attempts, and she was diagnosed with generalized anxiety disorder and bipolar disorder. Her chart was closed when she did not return for care after the intake, despite FCCC's attempts to contact her. Her history of outpatient care indicated a theme of not accepting recommended treatment. Dr. Mueller concluded that Kelley met the state guidelines for the insanity defense, that Kelley had had "a paranoid episode characterized by more than likely hallucinations commenting about her future stepdaughter, D.S. [that] caused her to act in an aggressive, assaultive manner." Id. at 5. Dr. Mueller then concluded

6

that Kelley was unable to appreciate the wrongfulness of her conduct at the time of the offense.

Dr. John Yarling evaluated Kelley on August 22, 2011, and also reviewed her records from FCCC (he was not given copies of the police reports). He conducted an interview with no psychological testing. Dr. Yarling summarized some of the events from Kelley's FCCC records, including her diagnosis with bipolar disorder, severe with psychotic features, and her history of missing appointments and discontinuing medications. During his interview with her, Kelley "presented very limited information regarding the incident with which she" was charged, and he noted that he had no other information about the incident beyond what she told him. Exh. B at 4. She reported to him that at the time of the incident she felt a "strong force" to harm D.S. and that a voice had told her to hurt D.S. Id. She had felt this force and heard this voice before and in the past has complied with it—by wrecking her car in 2003, for example. In 2009 though, she heard the voice and decided to wreck her car rather than comply with the thought she was having of choking her son. Dr. Yarling noted that "[s]ome of her comments suggested that she recognizes she should not become violent to herself or others." Id. She also told him that some of her moods are accompanied by thoughts that she cannot control, including hallucinations and delusions. He noted that she told him she had not been taking her anti-psychotic medication regularly for some time prior to the incident and that she believed that may have caused the attack; he also noted that she had been prescribed a long-lasting form of the drug that is usually injected intramuscularly every two weeks, but there is no indication in the record of when her last dose may have been given

7

prior to the incident. As far as a determination of her mental status at the time of the incident, Dr. Yarling found it "difficult as so little information regarding the incident" was known to him, and he hoped that additional information would be revealed during her trial. Id. Nevertheless, he concluded that "Kelley's description of her thoughts preceding the incident taken together with her history of previous serious mental illness is consistent with a recurrence of that illness at the time of the incident" and that it was therefore his "opinion with reasonable medical certainty, based upon [his] evaluation of Ms. Kelley and the information available to [him] that she was unable to appreciate the wrongfulness of her conduct at the time of the offense as a result of her mental disease."[2] Id. He noted that at the time of his evaluation, Kelley was taking an anti-psychotic medication and she was in control of herself and was able to respond appropriately to his questions and provide details about her life (although she provided very little about the incident underlying this case).

Kelley waived her right to a jury trial, and on October 15, 2012, a bench trial was held. No testimony was taken, and the parties stipulated to the police reports, the two psychiatrist reports, and some of D.S.'s medical records from her stay in the ICU. The parties gave closing argument, and the court took the matter under advisement. On January 11, 2013, the court issued its written order finding Kelley not guilty on count I and guilty but mentally ill on the remaining counts. On February 8, 2013, the court sentenced Kelley to an aggregate term of 4,800 days comprised of time served on count VI, aggravated sentences on the remaining counts, and all counts except count V ordered to be served consecutively. The

---

[2] Both Dr. Yarling and Dr. Mueller also concluded that Kelley was competent to stand trial.

court found no mitigating factors and four aggravating factors: the harm, injury, and loss suffered by D.S. was significant and greater than the elements necessary to prove the commission of the offense; Kelley had a significant history of criminal behavior;[3] Kelley had recently violated conditions of probation; and Kelley was in a position of care, custody, or control over D.S. The court also ordered that, because Kelley was found guilty but mentally ill, she be further evaluated and treated for her mental illness while in the Department of Correction. This appeal followed.

<u>Discussion and Decision[4]</u>

I. Determination of Sanity

A. Standard of Review

Indiana Code section 35-41-3-6 provides that "[a] person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense" and defines "mental disease or defect" as "a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct."

Whether a defendant can appreciate the wrongfulness of his conduct is a question for the trier of fact. <u>Thompson v. State</u>, 804 N.E.2d 1146, 1149 (Ind. 2004). A defendant who

---

[3] A presentencing report revealed that Kelley had two prior felony convictions, two prior misdemeanor convictions, and one pending felony in another county.

[4] We heard oral argument on November 21, 2013, at the Michigan City High School in Michigan City, Indiana. We thank the students, faculty, and staff of the school for the gracious reception, and counsel for their presentations.

9

claims that his insanity defense should have prevailed at trial appeals from a negative judgment, and we will only reverse when the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed. Id. We do not reweigh the evidence and we consider only the evidence most favorable to the judgment and the reasonable and logical inferences drawn therefrom. Id. The question is whether the inferences supporting the judgment were reasonable, not whether there were other "more reasonable" inferences that could have been made. Id. at 1150.

The insanity defense is an affirmative defense for which the defendant has the burden of proof. Id. at 1148. The State must prove all of the elements of the offense beyond a reasonable doubt, but need not disprove insanity. Id. In order to succeed with an insanity defense, the defendant must establish the defense by a preponderance of the evidence. Id. at 1149; see also Ind. Code § 35-41-4-1. A successful insanity defense results in the defendant being found not responsible by reason of insanity. Galloway v. State, 938 N.E.2d 699, 708 (Ind. 2010); see Ind. Code § 35-41-3-6(a). Because mental illness alone is not enough to establish the defense—the defendant must also show that the illness caused him to be unable to appreciate the wrongfulness of his conduct—a defendant who is mentally ill but fails to establish that he was unable to appreciate the wrongfulness of his conduct may be found guilty but mentally ill. Galloway, 938 N.E.2d at 708.

### B. Trial Court's Finding of Kelley as Guilty but Mentally Ill

Kelley argues that it was contrary to law for the trial court to find her guilty but mentally ill where the medical evaluations were unanimous that she was insane at the time of

the incident and there was no contradictory lay testimony.     Kelley cites to our supreme court's case of Barany v. State, 658 N.E.2d 60, 63 (Ind. 1995), and contends that without contradictory lay testimony, the court was not permitted to issue a judgment in contravention of the determination made by the psychiatrists. The State replies, citing to Thompson, that as the trier of fact the judge in this case was free to reject the expert testimony.

A series of cases from our supreme court illuminate the boundaries of a trial court's ability to override the determination of psychiatrists. In Barany, the facts at trial were stipulated, all three appointed psychiatrists agreed that Barany was incapable of appreciating the wrongfulness of his conduct at the time of the incident, but the jury returned a verdict of guilty but mentally ill. 658 N.E.2d at 63. Our supreme court upheld the verdict because the State had offered testimony from lay witnesses that indicated that Barany was sane. Our supreme court concluded that the jury could have decided that this testimony was more indicative of Barany's actual mental health at the time of the killing than were the medical examinations conducted weeks later. Id. at 64.

In Thompson, the defendant pleaded not guilty by reason of insanity and waived her right to a jury trial. 804 N.E.2d at 1148. The parties submitted the matter to the trial judge based on stipulated evidence, including the reports of court-appointed psychiatrists who concluded that Thompson was not able to understand the wrongfulness of her conduct. The trial court found Thompson guilty but mentally ill. Our supreme court held that, although expert opinions provide a "strong justification for raising the insanity defense," they are not necessarily determinative. Id. at 1149. The trier of fact is free to disregard expert testimony

11

and rely upon the testimony of lay witnesses. Id. The court noted that "testimony regarding behavior before, during, and after a crime may be more indicative of actual mental health at the time of the crime than mental exams conducted weeks or months later." Id. (citing to Barany, 658 N.E.2d at 64). However, the court also concluded that conflicting lay testimony is not required for the trier of fact to reject expert testimony and as a general rule, "factfinders are not required to believe a witness's testimony even when it is uncontradicted." Id. In that case, the court determined that the trier of fact was entitled to prefer other evidence in the record over the psychiatric examinations conducted weeks or months later. Specifically, at the sentencing hearing, the trial judge had cited Thompson's "history of avoiding criminal responsibility through her illness, her conflicting stories about what happened to her medication, her decision to use illegal drugs and drink alcohol while on her medication, and lies she told one of the examining psychiatrists regarding that use of drugs and alcohol" and had concluded that Thompson knew her actions were wrong but was using her illness to manipulate the system. Id. at 1150. Additionally the State pointed to further evidence in the record that would support the trial court's findings, including that Thompson took only her own possessions from the victim's home after breaking in as indicating her awareness of right and wrong, and the decision of police officers who stopped Thompson to release her as indicating they believed her to be lucid enough to go about her business. Id. at 1149.

Finally, in Galloway, our supreme court expanded on Thompson and further illuminated the appellate standard of review following a finding regarding sanity at the trial

12

court level, observing that the standard is deferential but not impossible. 938 N.E.2d at 709. The court noted that each time it had previously upheld a conviction sustaining the trier of fact's determination of sanity, even where there was non-conflicting expert testimony that the defendant was insane, there had been "other sufficient probative evidence from which a conflicting inference of sanity reasonably could be drawn." Id. at 710. Such probative evidence is usually in the form of lay testimony that conflicts with the experts, but may also come from other "probative demeanor evidence from which a conflicting inference of sanity may be drawn." Id. at 712. The court noted that such demeanor evidence may be most useful where there is some indication that the defendant is feigning insanity, although it may also be appropriate in cases where there is no evidence of feigning. Id. at 712-13. The court also noted that demeanor evidence is of more limited value when the defendant has a long history of mental illness, because the ability of the trier of fact to infer that a person's actions around the time of a crime are indicative of his actual mental health at the time of the crime is logical when the defendant is not prone to delusions or hallucinations, but when the defendant has a serious and well-documented mental disorder, that logic collapses. Id. at 713. The court concluded that evidence of demeanor during the crime is more probative than evidence of demeanor before and after a crime, and that, in general, demeanor evidence must be considered as a whole and in relation to all of the other evidence. Id. at 714. In the Galloway case, our supreme court determined that there was not sufficient evidence of probative value from which the trier of fact could have drawn an inference of sanity to conflict with the unanimous expert testimony. Id. There had been no lay witness testimony

13

that conflicted with the experts' opinions, and in fact three eyewitnesses testified that Galloway had been showing familiar signs of "losing it." Id. Additionally, the trial court had based its findings on the fact that Galloway had shopped, eaten, and filled his car with gas that day without incident, and that Galloway had cooperated with the police after the incident. Id. at 715. The Galloway court concluded that while those activities may represent normal events, "when viewed against the defendant's long history of mental illness with psychotic episodes, the defendant's demeanor during the crime, as testified to by three eyewitnesses, and the absence of any suggestions of feigning or malingering, this demeanor evidence is simply neutral and not probative of sanity." Id.

The question here, then, is whether there is sufficient probative evidence in the record from which the trial court could have inferred that Kelley was sane at the time of the stabbing, contrary to what the two psychiatrists determined. The record with this case is thin, and the trial court gave no indication in its judgment as to how it determined that Kelley was guilty but mentally ill rather than insane. While both psychiatrists seem to have reached their conclusions based on very little information, given that Kelley would not talk much about the incident, and they seem to have come to their conclusions on her mental status at the time of the crime based largely on her mental health history, the rest of the record is similarly devoid of much evidence. Shepard stated that there had been something wrong with Kelley that morning and she had been different since she returned from her mother's house that weekend, but he did not think she was capable of hurting D.S. D.S. said the only weird thing about Kelley before she began hitting D.S. was that she had said her kids made her mad and

she was looking for money and an ID. The police report indicates that Kelley initially complied with officers but then became combative, yelled for water, told them she had not done anything, and remained unruly at the jail. Both psychiatrists referenced Kelley's mental health record, which spans several years, and includes multiple visits with FCCC and various prescriptions for mental health conditions.

While it appears that there was a limited foundation for the psychiatrists' determinations, there is even less on which the trial court could have decided to disregard those determinations. Kelley has a documented history of mental illness, and there is no suggestion that she is feigning. Kelley's interactions with police officers after the incident—yelling for water, saying that she did not do anything—do not bolster a finding of sanity. Kelley's statement to Dr. Mueller that Shepard "knew what would happen," may indicate that Kelley understood the conduct, but does not necessarily indicate that she appreciated the <u>wrongfulness</u> of that conduct <u>at the time of the action</u>; Dr. Mueller's report suggests, in fact, that Kelley did not appreciate the wrongfulness of her conduct even in hindsight. In short, there was no lay witness testimony and little demeanor evidence from which the court could have deduced, contrary to the two psychiatrists, that Kelley was sane at the time of the incident. Relevantly, it seems that the only places from which the trial court could have drawn inferences of sanity are from certain statements within the psychiatrists' reports. However, unlike additional testimony or evidence produced at a more "typical" trial, those statements here were explicitly considered by the psychiatrists when reaching their determinations that Kelley was legally insane at the time of the incident. While we

15

sympathize with the difficult decision the trial court had to make in the face of a thin record and no live testimony, we conclude that there was not "other sufficient probative evidence from which a conflicting inference of sanity reasonably could be drawn," and therefore the trial court's finding of guilty but mentally ill was in error. Galloway, 938 N.E.2d at 710. We remand for the trial court to enter a finding of not guilty by reason of insanity on all counts of which Kelley was originally convicted.

## II. Sufficiency of the Evidence

Although we have concluded that the trial court should have found Kelley not guilty by reason of insanity, we address the issues of sufficiency of the evidence and double jeopardy and conclude that, had we upheld the trial court's finding of guilty but mentally ill, we nonetheless would have reversed Kelley's confinement conviction.

## A. Standard of Review

The standard for reviewing sufficiency of the evidence claims is well settled. We do not reweigh the evidence or assess the credibility of the witnesses. West v. State, 755 N.E.2d 173, 185 (Ind. 2001). Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict and will affirm the conviction if there is probative evidence from which a reasonable trier-of-fact could have found the defendant guilty beyond a reasonable doubt. Id.

## B. Identification of Kelley

Kelley first contends that there was insufficient evidence to convict her of any of the crimes because there was no in-court identification or other evidence linking Kelley to the

16

Tammy Kelley named in the police reports. This argument is unpersuasive. Both parties stipulated to the police reports, and Kelley did not object to their admission. There was never even a suggestion below that this Kelley was not the Kelley referenced in the reports. In fact, in opening statements her counsel said that the only question before the court was whether Kelley was legally responsible for the crimes—implying that there was no question about whether she had committed the crimes.

### C. Battery of Police Officers

Kelley next argues that there is insufficient evidence to support the two convictions for battery of a law enforcement officer, because there was no evidence that the officers suffered physical pain as a result of her kicking them in the groin. On the contrary, one of the police reports notes that <u>both officers</u> complained of "pain and discomfort in the groin area as a result of Kelley's strikes." Exh. 1 at 4. Any degree of bodily pain may constitute bodily injury for the purposes of the battery statute. <u>See</u> <u>Bailey v. State</u>, 979 N.E.2d 133, 142 (Ind. 2012). Sufficient evidence supported these convictions.

### D. Confinement

Kelley also argues that there is insufficient evidence to support her conviction for confinement because there is no evidence that she knowingly or intentionally confined D.S. or removed D.S. from the apartment. The criminal confinement statute provides that criminal confinement has occurred when a person knowingly or intentionally "(1) confines another person without the other person's consent; or (2) removes another person, by fraud, enticement, force, or threat of force, from one (1) place to another," and enhances the offense

17

to a Class C felony if "the person confined or removed is less than fourteen (14) years of age and is not the confining or removing person's child." Ind. Code § 35-42-3-3. The State argues that the sheer number of injuries indicate that D.S.'s liberty had been restrained and that Kelley restrained that liberty using a knife and a locked door, thus hindering D.S.'s ability to escape. We have previously held that in order to prove confinement beyond the main crime charged, there must be something more than the act necessary to effectuate the crime. Cunningham v. State, 870 N.E.2d 552, 553 (Ind. Ct. App. 2007). Moreover, "[a]n inference of confinement does not arise from evidence of injury to the victim." Id. at 554. If, however, the confinement is more extensive than necessary to commit the main offense, then conviction for confinement may be proper. Williams v. State, 889 N.E.2d 1274, 1281 (Ind. Ct. App. 2008), trans. denied.

Here, there is little to indicate confinement beyond battery. There is no indication that Kelley locked the door to the apartment to keep D.S. from escaping, and it is entirely possible that the door was locked from when Shepard had left earlier that morning. At one point, D.S. did report to the police that Kelley had her "on the floor, stabbing her and she [D.S.] rolled away from [Kelley] and got to the door." Exh. 2 at 6. However, having D.S. on the floor during part of the stabbing would be related to the attempted murder of which Kelley was acquitted.[5] The rest of the record does not indicate that Kelley otherwise held D.S. or blocked her, and D.S. indicated that she was moving around and dodging Kelley during the

_____

[5] The stabbing is the only part of the incident that could have gone to the attempted murder charge.

18

attack. We conclude that there was insufficient evidence to support Kelley's conviction for criminal confinement.

### III. Double Jeopardy: Kelley's Battery and Confinement Convictions

Although we have determined that there was insufficient evidence to support Kelley's conviction for criminal confinement, we briefly address the closely-related issue of double jeopardy. Kelley argues that her convictions for confinement and battery of D.S. were based on the same actual evidence and thus violate double jeopardy.

Our supreme court has concluded that two offenses are the same offense for double jeopardy purposes if, "with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." Richardson v. State, 717 N.E.2d 32, 49 (Ind. 1999) (emphasis in original). Under the actual evidence test, "the actual evidence presented at trial is examined to determine whether each challenged offense was established by separate and distinct facts." Id. at 53. To find a double jeopardy violation under this test, we must conclude that there is "a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense." Id. A "reasonable possibility" requires substantially more than a logical possibility, and "turns on a practical assessment of whether the [fact finder] may have latched on to exactly the same facts for both convictions." Garrett v. State, 992 N.E.2d 710, 719-20 (Ind. 2013) (quoting Lee v. State, 892 N.E.2d 1231, 1236 (Ind. 2008)). "We evaluate the evidence from the [fact

finder's] perspective and may consider the charging information, jury instructions, and arguments of counsel." Id. at 720.

Here, the charging information stated the elements of the crimes but did not include details to indicate which facts supported the individual charges. See Richardson, 717 N.E.2d at 51 ("Although the State may choose to do so, it is not required to include detailed factual allegations in the charging instrument.") (emphasis in original). Confinement was never mentioned in the arguments of either Kelley or the State at the trial. While it is possible that the court could have concluded that Kelley punching D.S. in the face supported the battery charge and stabbing D.S. while she was on the floor supported the confinement charge— setting aside for the moment the attempted murder charge—that is mere guesswork. The emphasis in both the record submitted to the court as well as the opening and closing arguments at trial was on the stabbings and on Kelley's mental status. We note that the State, in its brief, argues first that the confinement charge is supported by the sheer number of injuries inflicted on D.S., and later that "[t]he confinement continued between batteries." Brief of Appellee at 11. At oral argument, however, the State argued that Kelley holding D.S. down during part of the stabbing constituted confinement. This confusion on the part of the State as to which actions supported the confinement charge further indicate that there is a reasonable possibility that the trial court used the same facts to establish both the confinement and battery convictions. Thus, if we had reached the issue of double jeopardy, we would have concluded that Kelley's confinement conviction was barred by double jeopardy.

## Conclusion

Concluding that the trial court erred in contravening the unanimous determination of the psychiatrists that Kelley was insane at the time of the incident, we reverse and remand with instructions for the trial court to enter a finding of not guilty by reason of insanity.

Reversed and remanded.

RILEY, J., and KIRSCH, J., concurs.