

FILED

Dec 19 2017, 7:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Lori Barcroft,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | December 19, 2017<br><br>Court of Appeals Case No.<br>49A05-1704-CR-844<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Lisa F. Borges, Judge<br><br>Trial Court Cause No.<br>49G04-1205-MR-33537 |

**Najam, Judge.**

## Statement of the Case

[1]     Lori Barcroft appeals her convictions, following a bench trial, for murder and a sentencing enhancement for the unlawful use of a firearm in the commission of

an offense. Barcroft raises one issue on appeal, namely, whether the trial court erred when it rejected her insanity defense and found her guilty but mentally ill.

[2] We reverse and remand with instructions.

## Facts and Procedural History

[3] In 2007, Jordan Ashbury, one of Barcroft's adult sons, became concerned about Barcroft's deteriorating mental state, which he believed was caused because she was "demonically possessed." Add. at 5. According to Ashbury, Barcroft had begun to see messages on the refrigerator and she had become obsessed with the colors of cars. Ashbury asked Pastor Jaman Iseminger, the pastor at the church Barcroft and Ashbury attended, to help Barcroft. Pastor Iseminger told Ashbury that Barcroft needed to be prayed over and also hospitalized. After the ensuing death of her father, Barcroft deteriorated further, and Ashbury attempted to hospitalize her, but she refused. At the time, Barcroft lived with Ashbury and his wife, Tamia. However, on the advice of Pastor Iseminger, Ashbury told Barcroft that she could no longer live with them, as Tamia was fearful for her life. Barcroft then moved in with her mother.

[4] On the morning of May 19, 2012, Pastor Iseminger arrived at the church at approximately 6:45 a.m. in order to open the church kitchen for Jeff Harris, who was preparing to lead a workshop. Harris was in the kitchen when he noticed Barcroft walking around the outside of the church. Barcroft wore a black hooded sweatshirt with its hood up and dark jeans, and she carried a backpack. Harris went outside and saw Barcroft standing in an exterior

stairwell that led to the church's basement, where Pastor Iseminger's office was located, and looking in through a basement window. Harris asked Barcroft if he could help her, and Barcroft asked if Pastor Iseminger was there.

[5] Harris entered the church and went down the interior stairs to the basement, where he found Pastor Iseminger in his office. Harris told Pastor Iseminger that a woman was there to see him. Although Harris was not aware of it, Barcroft had entered the church behind him and was waiting near the top of the interior stairs. Pastor Iseminger followed Harris back up the stairs, and after Harris passed Barcroft, Barcroft shot at Pastor Iseminger. Barcroft turned, pointed the gun at Harris, and said "go, go." Tr. Vol. II at 119. Harris ran outside and called 9-1-1. As he ran, he heard two more gunshots. Harris then saw Barcroft leave the church and walk or jog along the building, cross the street, and go between two houses. Pastor Iseminger came up the exterior stairs, yelled for help, and collapsed on the ground. Lisa Walden, an attendee of the workshop, had been asleep in her car in the church parking lot when she heard the gunshots. Walden saw Pastor Iseminger fall to the ground, and she saw a woman dressed in all black walk away quickly. Walden rushed to help Pastor Iseminger while Harris talked to the 9-1-1 operator.

[6] Officers from the Southport and Indianapolis Metropolitan Police Departments, along with paramedics, responded to the 9-1-1 call. After they obtained a description of Barcroft and learned the direction of her flight, Officers John Czankusch and Daniel Ryan used a police dog to search for her. The dog alerted to an area about a block from the church that was overgrown with

vegetation. Barcroft was hidden under a blanket of vegetation in such a manner that the officers could only see some red fabric from her clothing or backpack. Officer Czankusch later testified that Barcroft was so well-hidden that the officers probably would not have found her without the police dog or unless they had actually stepped on her. Officer Ryan ordered Barcroft twice to come out. Barcroft did not respond to the first command. When he made the second command, Officer Ryan told Barcroft that he would shoot her if she did not come out or if she did not show her hands. Barcroft then crawled out from under the vegetation and Officer Czankusch placed Barcroft in handcuffs. Officer Ryan asked Barcroft if she had a gun, and Barcroft said she did and informed him that the gun was in her jacket pocket. At the time of her arrest, Officer Ryan described Barcroft's demeanor as "very quiet and calm" and cooperative. *Id*. at 65. Detective Michael Mitchell arrived at the scene, and Barcroft volunteered to him, "I'm the one you're looking for." *Id.* at 142. Detective Mitchell also described her demeanor at the scene as calm. Officers soon learned that Pastor Iseminger had been pronounced dead at the hospital from a gunshot wound to his chest.

[7] Officers took Barcroft into custody and placed her in an interview room. Detective Mitchell entered the room, told Barcroft to have a seat, and informed her that he was conducting an investigation. Detective Mitchell read Barcroft her *Miranda* rights. Detective Mitchell did not ask any questions, but Barcroft gave a lengthy narrative in which she admitted that she had shot Pastor Iseminger.

[8] During her statement to Detective Mitchell, Barcroft disclosed a complex and extensive system of beliefs and delusions that experts later diagnosed as schizophrenia, paranoid type, or delusional disorder, persecutory type. According to her statement to Detective Mitchell, the delusions began around 1999 or 2000, when Barcroft took in a pregnant woman from Colombia. When the woman's baby was one year old, Barcroft traveled to Colombia for the baby's baptism, where she met the baby's father, whom she said was named Rafael Medina. She often called him "R" or "Rafa." Add. at 7. Barcroft believed that this man controlled most of the world's cocaine and was the wealthiest man in the world. Barcroft said that in 2007, R asked her to marry him, which made her a "Class KK, uh, 9-9-5-5-7-7" in the Colombian mafia and also pitted Barcroft against his enemies, which included the family of Presidents George H.W. and George W. Bush. *Id.* According to Barcroft, the Bush family was allied with the Mexican mafia and was involved in cocaine and human trafficking. Barcroft thought the Bush family had asked Osama Bin Laden to commit the September 11, 2001, terrorist attacks and had tried to kill President Barack H. Obama in order for Jeb Bush to take over the White House. Barcroft stated she had twice intervened to save President Obama's life. Barcroft also said that R had a network of spy satellites and that they were being watched at that moment. Barcroft further stated that President George W. Bush and Ambassador William Brownfield were "slaughtering the handicapped in Columbia. They handicapped the babies[,] and they human traffic." *Id.* at 8. They also put Barcroft up for an "electronic auction." *Id.*

[9] Pastor Iseminger was an integral part of Barcroft's delusional scheme in that she thought he was controlled by the Bush family and the Mexican mafia. In particular, in her statement to Detective Mitchell Barcroft stated that Pastor Iseminger was responsible for the death of her father in 2010. Although her father's official cause of death was congestive heart failure, Barcroft claimed to have received a message that Pastor Iseminger had caused her father to be smothered to death. Barcroft also believed that Jeb Bush had killed her grandmother and that the Bush family and Pastor Iseminger had caused her grandson to be infected with Kawasaki disease. Barcroft further said that Pastor Iseminger had been lying about her to make people hate her and have her appear to be of a lower class than she was to get her killed.

[10] During her statement to Detective Mitchell, Barcroft further stated:

> Ah, uh, what happened is, uh, Jaman, who I shot, he, um, basically is the cause of all of this. And he's 4. Nobody else can do this but me. I'm 5. And what he's been doing is uh . . . I'm not a killer, by the way, but I'm the only one (chuckling) that can do it.

*Id*. at 8 (ellipses in original). She went on to state that

> I'm the only one that could take care of Jaman. That's the reason why I did it. It wasn't even vengeance for . . . I mean, he was gonna try to pick off my family one by one. Not himself, the people that, that act for him. And I was basically told that, uh, since he's 4A . . . Bush family is 4A . . . [.] And he's not Mafia O, by the way. He's Z. Uh, and I'm Mafia O. I'm the only one, uh, I'm top "O" Queen.

> They want me dead. So they lie, lie, lie, and lie. Jaman's a big part of it.

*Id*. at 11 (some ellipses in original).

[11] Near the end of her statement, Detective Mitchell told Barcroft, "you understand that you have to be arrested for this . . . ." *Id.* at 15. Barcroft replied, "I do understand that." *Id*. She further stated: "I actually planned on not getting caught[,] but I did." *Id.* Barcroft continued, "And like I said, I'm not some sort of murderer or anything." *Id.*

[12] Barcroft's mental health records showed that she had been seen at Midtown Mental Health in Indianapolis intermittently between 2004 and 2006 and again between 2008 and 2010. At that time she was diagnosed with attention deficit hyperactivity disorder and prescribed Adderall, although the experts who evaluated her in the instant case had reviewed her mental health records and believed that her symptoms were more suggestive of psychosis. Her records also reflected that, in 2007, Barcroft presented at Halifax Medical Center in Florida and was seen in the psychiatric ward where she claimed to have hitchhiked from Indiana. Barcroft was dehydrated, and she was afraid federal agents were pursuing her. Despite those paranoid symptoms, Barcroft did not meet Florida's standards for involuntary commitment and only stayed in the psychiatric ward for three days. After Barcroft's arrest in the instant case, she

refused anti-psychotic medications and claimed that she did not suffer from a mental illness.

[13] On May 21, 2012, the State charged Barcroft with murder and sought a sentencing enhancement for the use of a firearm. On August 29, 2012, Barcroft filed a motion for a competency and sanity evaluation. On December 14, the trial court found that Barcroft lacked the ability to understand the proceedings or to assist in her defense, but the court subsequently reversed that determination. On November 16, 2016, Barcroft, who was represented by counsel, waived her right to a jury trial. The trial court held a bench trial on February 21 and March 1, 2017.[1]

[14] During the trial, three expert witnesses testified: defense psychologist Dr. Stephanie Callaway, court-appointed psychologist Dr. Don Olive, and court-appointed psychiatrist Dr. George Parker. Dr. Olive and Dr. Callaway diagnosed Barcroft with schizophrenia, paranoid type, while Dr. Parker diagnosed her with delusional disorder. But each of the expert witnesses concluded that Barcroft had a mental illness, and, based on that mental illness, she was unable to appreciate the wrongfulness of her conduct at the time she killed Pastor Iseminger.

---

[1] The trial court held a bench trial on January 27 and March 5, 2014, and found Barcroft guilty but mentally ill on March 14. Barcroft appealed and this court reversed her conviction and remanded for a new trial. *Barcroft v. State*, 26 N.E.3d 641 (Ind. Ct. App. 2015).

[15] Specifically, Dr. Callaway determined that Barcroft was mentally ill and could not appreciate the wrongfulness of her conduct. Prior to writing her report, Dr. Callaway did not review the medical records from the jail or the videotaped statement Barcroft made to Officer Mitchell. Instead, she relied on Barcroft's medical and pharmaceutical records, an interview Dr. Callaway had with Barcroft, letters and notes that Barcroft had written, and an interview Barcroft had had with a social worker after the arrest. After she had written her report based on that information, Dr. Callaway then reviewed Barcroft's videotaped statement to Officer Mitchell. In her testimony, Dr. Callaway testified that the video "cemented my opinion." Tr. Vol. II at 192.

[16] Dr. Callaway testified that Barcroft's delusions were driving Barcroft's behavior. She stated that Barcroft had purchased a gun because "she [saw] a sign." *Id*. at 208. Dr. Calloway also stated that Barcroft's actions of hiding the weapon and not harming the witness were motivated by her delusion. Dr. Callaway further testified: "it also speaks to there's [sic] a witness standing in plain sight, and she does this anyway. So to me, that speaks more to the fact that she doesn't think it's wrong versus . . . anything else." *Id*. at 211. Dr. Calloway testified that Barcroft's behavior when she fled and hid after the shooting was important. She stated that Barcroft "described being fearful that [Pastor Iseminger] was coming after her." *Id*. Finally, she testified that Barcroft's calm behavior after her arrest was consistent with her delusions because "she thought it was absolutely legal, and she had the right to do what

she did. And so being calm and cooperative fits with that." *Id.* at 212. Dr. Calloway testified that there was no evidence of malingering.

[17] Dr. Olive also concluded that Barcroft did not appreciate the wrongfulness of her conduct at the time she shot Pastor Iseminger. In order to make this determination, Dr. Olive reviewed the videotaped statement to Detective Mitchell, the probable cause affidavit, records from the Marion County Jail, Dr. Callaway's report, medical and pharmaceutical records, notes from the social worker, and Barcroft's letters. In addition, Dr. Olive interviewed Barcroft, but she did not provide much detailed information to Dr. Olive. During trial, Dr. Olive testified that there was no reality-based explanation for why Barcroft shot Pastor Iseminger. He also testified that it is part of his training to look at an act that might appear rational to somebody who can appreciate the wrongfulness of her conduct and to put those actions in the eyes of somebody who acts under a delusion. He stated that nothing he had heard about Barcroft's demeanor had changed his opinion that she could not appreciate the wrongfulness of her conduct. Dr. Olive also testified that he looked for signs of malingering, but even after he was told that Barcroft had almost obtained a degree in psychology, his opinion did not change.

[18] Dr. Parker also determined that Barcroft could not appreciate the wrongfulness of her conduct at the time she shot Pastor Iseminger. Prior to writing his report, Dr. Parker reviewed the probable cause affidavit, jail mental health records, Dr. Callaway's report, letters Barcroft wrote to the court, medical records, and a summary of meetings between Barcroft and the social worker. He also

interviewed Barcroft. Dr. Parker testified that he was "almost certain [Barcroft] was actively delusional at the time of the alleged offense" and "it is clear that Miss Barcroft's delusions obviously affected her overall functioning, and in fact her behavior on the day of the alleged offense," such that she could not appreciate the wrongfulness of her conduct at the time of the offense. Tr. Vol. III at 22. Dr. Parker further testified that Barcroft believed she was "justified and that she was not doing a wrong thing." *Id*. at 24.

[19] Barcroft's counsel asked Dr. Parker about her behavior on the day of the shooting. In response, Dr. Parker testified as follows:

> Well, you . . . have to understand that her behaviors are all driven by the delusions themselves. So if she's convinced with complete certainty, absolute certainty, that she is the nexus of this complex grandiose delusional scheme which involves Columbian cartels, Mexican mafia, the Bush family, satellites in the sky, her family being at risk of being killed, herself at risk, well, then taking actions to keep yourself safe, to prevent harm from coming to you or your family, that becomes rational in that context. And so what looks like planning and preparation shows not that she's disorganized; she's organized. But it's all driven by the delusional system. There is not a rational reason to do all that because she's preparing for something that might involve shooting somebody.

Tr. Vol. III at 46-47. Dr. Parker further testified that the evidence of Barcroft's calm demeanor with police did not change his opinion as to her mental state at the time she shot Pastor Iseminger. He also stated that he saw no evidence of malingering.

[20] In addition to the expert witnesses, several lay witnesses testified, including Officer Ryan, Officer Czenkusch, Detective Mitchell, Harris, and Walden. None of these witnesses knew Barcroft prior to the day of the shooting and none of them testified as to whether she understood the wrongfulness of her conduct when she shot Pastor Iseminger.

[21] The trial court found Barcroft guilty but mentally ill and convicted her of murder and the firearm sentencing enhancement. While, the trial court found that Barcroft "clearly" had a mental disease or defect, the court concluded that she appreciated the wrongfulness of her conduct at the time she shot Pastor Iseminger based on the following demeanor evidence: she had a motivation to commit the crime outside of her delusion because Pastor Iseminger advised Ashbury to have Barcroft move out of their home; she told a witness to leave the scene of the shooting; she planned the offense in advance; she waited for Pastor Iseminger; she found a place to hide after the offense that was so well-hidden the officers could only find her with the use of a police dog; and she told Officer Mitchell that she did not intend to get caught. Tr. Vol. III at 104. Thereafter, the trial court sentenced Barcroft to an aggregate term of fifty-five years in the Indiana Department of Correction with five years suspended to mental health probation. This appeal ensued.

## Discussion and Decision

[22] Barcroft asserts that the trial court erred when it rejected her insanity defense and found her guilty but mentally ill based on its conclusion that she appreciated the wrongfulness of her conduct. To be convicted of a criminal

offense, the State must prove each element of the offense beyond a reasonable doubt. *See* Ind. Code § 35-41-4-1(a) (2017). Criminal responsibility can be avoided if the defendant can successfully raise and establish the "insanity defense." *Galloway v. State,* 938 N.E.2d 699, 708 (Ind. 2010); *see also* I.C. § 35-41-3-6(a). To successfully assert that defense, an individual must prove by a preponderance of the evidence: "(1) that he or she suffers from a mental illness and (2) that the mental illness rendered him or her unable to appreciate the wrongfulness of his or her conduct at the time of the offense." *Galloway,* 938 N.E.2d at 708. "Thus, mental illness alone is not sufficient to relieve criminal responsibility." *Id.*

[23]     We note that Barcroft asserted an insanity defense, but the trial court found her guilty but mentally ill. "A successful insanity defense results in the defendant being found not responsible by reason of insanity." *Kelley v. State*, 2 N.E.3d 777, 783 (Ind. Ct. App. 2014); *see also* I.C. § 35-41-3-6(a). However, "a defendant who is mentally ill but fails to establish that he is she was unable to appreciate the wrongfulness of his or her conduct may be found guilty but mentally ill." *Galloway*, 938 N.E.2d at 708

[24]     Barcroft's argument on appeal is that there was insufficient evidence in the record from which the trial court could have inferred that she was sane at the time she shot Pastor Iseminger, contrary to what the three experts determined. In particular, Barcroft asserts that the State failed to present sufficient evidence to show that she understood the wrongfulness of her conduct at the time of the

offense.  As our Supreme Court has explained, we review such appeals as follows:

Whether a defendant appreciated the wrongfulness of his or her conduct at the time of the offense is a question for the trier of fact.  Indiana Code [S]ection 35-36-2-2 provides for the use of expert testimony to assist the trier of fact in determining the defendant's insanity.  Such expert testimony, however, is merely advisory, and even unanimous expert testimony is not conclusive on the issue of sanity.  The trier of fact is free to disregard the unanimous testimony of experts and rely on conflicting testimony by lay witnesses.  And even if there is no conflicting lay testimony, the trier of fact is free to disregard or discredit the expert testimony.

Because it is the trier of fact's province to weigh the evidence and assess witness credibility, a finding that a defendant was not insane at the time of the offense warrants substantial deference from reviewing courts.  A defendant claiming the insanity defense should have prevailed at trial faces a heavy burden because he or she is in the position of one appealing from a negative judgment.  A court on review will not reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of fact (even though more reasonable inferences could have been made).

Although this standard of review is deferential, it is not impossible, nor can it be.  The Indiana Constitution guarantees "in all cases an absolute right to one appeal."  Ind. Const. art. VII, § 6.  An impossible standard of review under which appellate courts merely "rubber stamp" the fact finder's determinations, no matter how unreasonable, would raise serious constitutional concerns because it would make the right to an appeal illusory.  As such, this Court has long held that where the defendant claims the insanity defense should have prevailed, the

conviction will be set aside when the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed.

*Galloway*, 938 N.E.2d at 709-10 (footnote, citations, and quotation marks omitted).

[25] Here, the three mental-health experts unanimously agreed that Barcroft's mental illness made her incapable of appreciating the wrongfulness of her conduct at the time of the offense. There was no lay opinion testimony to the contrary. Nonetheless, where, as here, there is no conflict among the expert and lay witnesses, the trial court can still find a defendant sane at the time of the crime if there is probative demeanor evidence from which an inference of sanity can be drawn. *See Galloway*, 938 N.E.2d at 712.

[26] Nevertheless, while demeanor evidence is often useful, "there are limits to its probative value." *Id.* As our Supreme Court has made clear:

> [D]emeanor evidence is of more limited value when the defendant has a long history of mental illness with psychosis. As the Court of Appeals previously explained[:]
>
> > While the jury is the ultimate finder of fact, we fail to see how evidence of a defendant's demeanor before and after a crime can have much probative value when a schizophrenic defendant is involved . . . .
>
> * * *

> The proposition that a jury may infer that a person's actions before and after a crime are "indicative of his actual mental health at the time of the" crime is logical when dealing with a defendant who is not prone to delusional or hallucinogenic episodes. However, when a defendant has a serious and well-documented mental disorder, such as schizophrenia, one that causes him to see, hear, and believe realities that do not exist, such logic collapses . . . .

*Id*. at 713 (quoting *Moler v. State*, 782 N.E.2d 454, 458-59 (Ind. Ct. App. 2003)) (omissions original to *Galloway*). Further, our Supreme Court stated that "as a general rule, demeanor evidence must be considered as a whole, in relation to all the other evidence." *Galloway*, 9387 N.E.2d at 714.

[27] Here, the trial court concluded that Barcroft appreciated the wrongfulness of her conduct at the time she shot Pastor Iseminger based only on demeanor evidence. In particular, the court's conclusion was based exclusively on the following demeanor evidence: she had a motivation to commit the crime outside of her delusion because Pastor Iseminger advised Ashbury to have Barcroft move out of their home; she told a witness to leave the scene of the shooting; she planned the offense in advance; she waited for Pastor Iseminger; she found a place to hide after the offense; and she told Officer Mitchell that she did not intend to get caught.

[28] On appeal, Barcroft contends that the trial court failed to consider the demeanor evidence in relation to all other evidence. She further contends that, when the demeanor evidence is properly considered in relation to all other

evidence, in particular the unanimous opinions of the expert witnesses, the demeanor evidence does not support a reasonable inference that she was able to appreciate the wrongfulness of her conduct at the time of the offenses. In essence, Barcroft asserts that the evidence is without conflict and leads only to the conclusion that she was unable to appreciate the wrongfulness of her conduct at the time of the offense. We must agree.

[29] In *Galloway*, the Indiana Supreme Court reversed the defendant's guilty but mentally ill conviction for murder. The defendant in that case had a long history of mental illness. At his trial, the experts unanimously agreed that the defendant was insane at the time of the murder, and the testimony of the lay witnesses did not conflict with the testimony of the expert witnesses. In its opinion, our Supreme Court stated:

> [The trial court] found as probative of sanity the fact that, over the course of an hour, the defendant shopped, ate, and filled a car with gasoline without incident. It also found as probative the fact that the defendant cooperated with police after the fact. Viewed in isolation, each of these events may indeed represent the normal events of daily life. However, when viewed against the defendant's long history of mental illness with psychotic episodes, the defendant's demeanor during the crime, as testified to by three eyewitnesses, and the absence of any suggestions of feigning or malingering, *this demeanor evidence is simply neutral and not probative of sanity*.

*Id*. at 715 (emphasis added).

[30] *Galloway* is on all fours with Barcroft's case. Here, the trial court found as probative of Barcroft's sanity the fact that she had a motivation to commit the crime outside of her delusion; that she told a witness to leave; that she planned the offense in advance; that she waited for Pastor Iseminger; that she found a place to hide after the offense; and that she told Officer Mitchell that she did not intend to get caught. "Viewed in isolation, each of these events may indeed" represent sanity in a person with no history of serious mental illness. *Id.* However, when viewed in light of Barcroft's long-standing and complex delusional system, the unanimous opinions of the three experts, each of whom took Barcroft's behavior during the incident into account, and in the absence of any evidence of malingering, the demeanor evidence relied on by the trial court simply had no probative value on the question of her sanity.

[31] Our opinion today is also consistent with our holding in *Kelley*, 2 N.E.3d at 786, where this court reversed the defendant's guilty but mentally ill conviction for criminal confinement, three counts of battery resulting in bodily injury, and resisting law enforcement. In that case, the defendant had a documented history of mental illness, there was no evidence of feigning or malingering, and both expert witnesses testified that the defendant was unable to appreciate the wrongfulness of her conduct. The defendant also had made a statement to the psychiatrist that she had told the victim's father that he "knew what would happen." *Id*. at 781. Following the incident, the defendant was originally calm, but she then began yelling for water and said she did not do anything. There was no lay witness testimony.

[32] The trial court based its judgment only on the demeanor evidence, namely, the defendant's interaction with police after the incident and her statement to the victim's father. On appeal, we held that the statement to the victim's father that he knew what would happen may have indicated that the defendant understood the conduct, but it did "not necessarily indicate that she appreciated the *wrongfulness* of that conduct *at the time of the action.*" *Id*. at 786 (emphasis in original). Further, we held that the experts had already explicitly considered the statement to the victim's father when they had unanimously determined that the defendant was insane at the time of the offense. *Id*.

[33] As in *Kelley*, the experts in the current case had taken into consideration Barcroft's demeanor when they unanimously determined that she was unable to appreciate the wrongfulness of her actions at the time she committed the offense. Specifically, Dr. Callaway testified that Barcroft purchased the gun because of "a sign" in her delusion, that she did not harm the witness because he was not a part of her delusion, that she fled and hid because she was fearful of Pastor Iseminger, and that she was cooperative with police because she believed she had done nothing wrong. Tr. Vol. II at 208. Based on that evidence, Dr. Callaway believed Barcroft's behavior confirmed that she did not appreciate the wrongfulness of her conduct because she believed it was legal to shoot Pastor Iseminger.

[34] Dr. Olive likewise testified that there was no reality-based explanation for Barcroft's actions. He testified that the additional evidence of her behavior at the time of her arrest did not change his opinion that she did not appreciate the

wrongfulness of her conduct at the time of the offense. And Dr. Parker also testified that he was "almost certain she was actively delusional at the time of the alleged offense" and she thought she was "justified and that she was not doing a wrong thing." Tr. Vol. III at 22, 24. He further testified that her behaviors were driven by the delusions themselves and that her behavior immediately after the shooting did not change his opinion about her mental state at the time of the offense.

[35] The demeanor evidence relied on by the trial court was of no probative value due to Barcroft's lengthy history of a mental illness, which includes complex delusions, and because the expert witnesses took into consideration the demeanor evidence when they concluded that she could not appreciate the wrongfulness of her conduct at the time of the offense. The evidence that is of probative value is without conflict and leads only to the conclusion that Barcroft was unable to appreciate the wrongfulness of her conduct and, therefore, was insane at the time of the offense. Accordingly, we reverse the trial court's judgment that Barcroft is guilty but mentally ill and remand for the trial court to enter a finding of not guilty by reason of insanity.

[36] Reversed and remanded.

Kirsch, J., concurs.

Brown, J., dissents with separate opinion.

| | |
|---|---|
| Lori Barcroft, <br><br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br><br> *Appellees-Defendants.* | Court of Appeals Case No. <br> 49A05-1704-CR-844 |

**Brown, Judge, dissenting.**

[37] I respectfully dissent from the majority as to its finding that the evidence of probative value leads only to the conclusion that Barcroft was insane, or unable to appreciate the wrongfulness of her conduct, at the time of the offense.

[38] The Indiana Supreme Court has noted that a "finding that a defendant was not insane at the time of the offense warrants substantial deference from reviewing courts." *Myers v. State*, 27 N.E.3d 1069, 1074 (Ind. 2015) (citing *Galloway v.*

*State*, 938 N.E.2d 699, 709 (Ind. 2010) (citing *Barany v. State*, 658 N.E.2d 60, 63 (Ind. 1995))). Thus, when a defendant claims that an insanity defense should have been successful, the conviction will be set aside only "when the evidence is *without conflict* and leads only to the conclusion that the defendant was insane when the crime was committed." *Id.* (quoting *Galloway*, 938 N.E.2d at 710 (quoting *Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004) (emphasis added in *Galloway*))). "[T]estimony regarding behavior before, during, and after a crime may be more indicative of actual mental health at [the] time of the crime than mental exams conducted weeks or months later." *Id.* at 1076 (citing *Thompson*, 804 N.E.2d at 1149 (citing *Barany*, 658 N.E.2d at 64)). Even if there is no conflicting lay testimony, the factfinder is free to disregard or discredit the expert testimony. *Galloway*, 938 N.E.2d at 709 (citing *Thompson*, 804 N.E.2d at 1149).

[39] Though it is undisputed that Barcroft is mentally ill, her demeanor, behavior, and statements before, during, and immediately after the crime, are probative and supportive of a reasonable inference of sanity. The trial court observed that she planned the murder and attempted to avoid culpability: Barcroft "lay in wait for [Pastor Iseminger]," "found a place to hide after the offense by the fact that it was so quick from the time that – and the police arrives at like one minute after the 911 call," "scoped that out and knew there was a good place to hide," and "talked to the detective," stating "I had to take him out." Transcript Volume 3 at 105-106. More importantly, the trial court determined that

at the same time, there exists a big separate and conflicting motivation to commit this crime. [Barcroft] was well aware of [Pastor Iseminger's] ability to talk with her family and that – that – that [Pastor Iseminger] knew about what her family thought. And I believe the actions that she took that day were in response to that motivation. The motivation to avoid having to be somehow under an immediate detention to be reviewed for any sort of a problem that she was having. . . . [S]he's well aware of the things that are oaky [sic] to do and things that aren't okay to do. I think she just had an alternative mot – motive. And I'm persuaded by the alternative motion [sic]. . . . I think it's easy for her to co-op [sic] things in reality into that delusion."

*Id.* at 104, 106-107. This Court should not invade the factfinder's determinations, and accordingly I would conclude that the trial court did not err in finding that Barcroft failed to prove her insanity defense. *See Carson v. State*, 963 N.E.2d 670, 678 (Ind. Ct. App. 2012) (holding that the evidence supported a reasonable inference that defendant appreciated the wrongfulness of his conduct and "therefore the evidence is not without conflict and does not lead only to the conclusion that [defendant] could not appreciate the wrongfulness of his actions," and reviewing "a number of Indiana cases" where the appellate court has upheld the guilty but mentally ill convictions of defendants "claiming that he or she should have been found [not responsible by reason of insanity] on the basis of nonconflicting expert testimony"), *trans. denied*.

[40] For the foregoing reasons, I respectfully dissent and would affirm the trial court's finding that Barcroft was guilty but mentally ill.